# STATE OF NORTH CAROLINA

_____**CATAWBA**_____ County

File No.
18-CVS- 1495

In The General Court Of Justice
☐ District ☒ Superior Court Division

| Name Of Plaintiff | |
|---|---|
| CAPITAL CONCEPTS, LLC | **CIVIL SUMMONS** |
| Address | ☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)** |
| c/o Patrick Harper & Dixon L.L.P., P.O. Box 218 | |
| City, State, Zip | G.S. 1A-1, Rules 3 and 4 |
| Hickory          NC       28603 | |
| **VERSUS** | Date Original Summons Issued |
| Name Of Defendant(s) | |
| ARCH INSURANCE COMPANY | Date(s) Subsequent Summons(es) Issued |

## To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| Arch Insurance Company | |
| 300 Plaza Three, 3rd Floor | |
| Jersey City          NJ      07311 | |

⚠️ **IMPORTANT! You have been sued!** These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra!** Estos papeles son documentos legales. ¡NO TIRE estos papeles!

Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff) | Date Issued 5·30·18 | Time 2:48 ☐ AM ☒ PM |
|---|---|---|
| Michael P. Thomas | Signature | |
| Patrick Harper & Dixon L.L.P. | _Erica Figueroa_ | |
| P.O. Box 218 | | |
| Hickory          NC       28603 | ☒ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

| ☐ ENDORSEMENT (ASSESS FEE) | Date Of Endorsement | Time |
|---|---|---|
| This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | | ☐ AM ☐ PM |
| | Signature | |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.

**RECEIVED**

JUN 0 5 2018

Arch Insurance Group
Legal Department

(Over)

STATE OF NORTH CAROLINA

CATAWBA COUNTY

FILED

2018 MAY 30 P 2: 51

CATAWBA CO., C.S.C.
BY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 18 CVS 1495

CAPITAL CONCEPTS, LLC,                    )
                                          )
        Plaintiff,                        )
                                          )
v.                                        )               **COMPLAINT**
                                          )
ARCH INSURANCE COMPANY,                   )
                                          )
        Defendant.                        )
                                          )
                                          )

---

The Plaintiff, Capital Concepts, LLC complaining of the acts of the Defendant, Arch Insurance Company, alleges and says as follows:

1. This is an action for declaratory judgment pursuant to N.C.G.S. § 1-253, §1-254 and Rule 57 of the North Carolina Rules of Civil Procedure.

2. Capital Concepts, LLC ("Plaintiff" or "Capital Concepts") is a limited liability company organized and existing under the laws of the state of North Carolina, with its principal place of business in Catawba County, North Carolina.

3. Arch Insurance Company ("Defendant" or "Arch") is an insurance company, licensed to transact insurance business in the state of North Carolina and subject to the jurisdiction of its courts, including in Catawba County.

4. Plaintiff has been sued by Hickory Springs Manufacturing Company ("HSM") in Catawba County Superior Court, File No., 18 CVS 158, (the "Underlying Litigation") and a copy of the Complaint in the Underlying Litigation is attached as Exhibit A.

5. Also named as defendants in the Underlying Litigation are Robert V. Donovan ("Donovan"), Compensation Consultants, LLC ("Compensation Consultants") and The Penn Mutual Life Insurance Company and The Penn Insurance and Annuity Company (together "Penn Mutual").

6. The claims presented by HSM in the Underlying Litigation were first presented to Donovan, Compensation Consultants, and Capital Concepts when HSM filed an Application and Order Extending Time to File Complaint in Catawba County Superior Court, bearing File No. 16 CVS 2545 on October 3, 2106 (the "Application").

7.  This Application was served on Capital Concepts through its Managing Member and Registered Agent, David Sparks ("Sparks"), in October, 2016.

8.  This Application was also served on Donovan and Compensation Consultants in October, 2016.

9.  Donovan presented the claims set forth in the Application to Arch, which insured him under a policy of insurance bearing Policy No. CAP0050281 04, a copy of which is attached as Exhibit B.

10. Pursuant to that policy, Arch insures not only Donovan, but also any business entity "owned and controlled by" Donovan "with respect to liability of such organization as it arises out of" Donovan's "rendering or failing to render Professional Services."

11. Donovan was and is a Member (and thus an owner) of Capital Concepts at all relevant times.

12. Upon receipt of the Application and claims related to it, Arch retained Jacob Wellman, of Teague Campbell Dennis and Gorham ("Wellman") to represent Donovan, Compensation Consultants, and Capital Concepts.

13. Neither Wellman nor Donovan contacted Sparks as Managing Member of Capital Concepts to inform him of the claims. Sparks heard nothing further after the Application until the Underlying Litigation was served on him.

14. Nevertheless, Wellman agreed to a tolling agreement on behalf of Donovan, Compensation Consultants, and Capital Concepts and signed that agreement himself, on behalf of all three insured clients (the "Tolling Agreement"). A copy of the Tolling Agreement is attached as Exhibit C.

15. Upon being served with the Underlying Litigation, Sparks and Capital Concepts investigated the situation, learned that Wellman had been engaged by Arch to defend Capital Concepts, and communicated to Arch that, because Capital Concepts interests were not aligned with Donovan's and Compensation Consultants', Capital Concepts desired separate counsel for its defense in the Underlying Litigation who would take direction from Sparks as Managing Member.

16. Upon receiving that request, Arch, through its third-party administrator, Lancer, declared for the first time that it did not agree it had or has indemnity or defense obligations to Capital Concepts with regard to the Underlying Litigation.

17. Despite repeated demand, Arch has refused to provide a copy of the policy to Capital Concepts, which was forced to issue a subpoena to Donovan to obtain a copy.

18. Despite repeated demand, Arch has refused to provide any explanation for its refusal to provide separate counsel to Capital Concepts even though it initially accepted its obligation to defend the claims as set forth for Capital Concepts in the Application and instructed

Wellman to agree to the tolling agreement on behalf of Capital Concepts without consulting Sparks.

19. In fact, since the initial communication from Arch, through Lancer, indicating that Arch was withdrawing its defense of Capital Concepts, Arch, through Lancer, has entirely refused to respond to repeated requests for information or explanation of its position. In short, Arch has decided to ignore Capital Concepts.

20. Capital Concepts has inquired of HSM of its basis for including Capital Concepts as a defendant in the underlying litigation, and HSM has provided Capital Concepts the documents attached as Exhibit D, which show Donovan using Capital Concepts' name in providing information to HSM.

21. Thus, to the extent Donovan was or purported to be rendering professional services to HSM on behalf of Capital Concepts, he controlled Capital Concepts in doing so triggered coverage under the Policy at issue.

22. Thus, to the extent Capital Concepts may be liable to HSM for the actions of Donovan, Capital Concepts is covered by the Policy.

23. In addition, the claims asserted in the Underlying Litigation obligate Arch to provide a defense to Capital Concepts.

24. By retaining counsel for Capital Concepts, and instructing that counsel to enter into the Tolling Agreement, Arch engaged in a positive act that amounted to a ratification of its obligation to provide coverage and a defense. That positive act – the Tolling Agreement -- benefitted Arch and results in prejudice to Capital Concepts.

25. After Arch ratified its obligation to provide coverage and defend Capital Concepts by entering into the Tolling Agreement, and then failed to provide a defense, contrary to its prior position, Capital Concepts is forced to incur defense costs and is injured thereby.

26. After acknowledging their obligation to defend, and accepting the benefits of the Tolling Agreement, Arch is estopped from denying coverage or defense obligations under the Policy.

27. Capital Concepts is entitled to a declaratory judgment declaring that Arch has defense obligations under the Policy.

28. Capital Concepts is entitled to a declaratory judgment, declaring that Arch has indemnity obligations under the Policy.

29. Capital Concepts has already incurred legal fees and other costs in defending the Underlying Litigation and will continue to do so until Arch undertakes a defense. These costs are damages proximately caused by Arch's breach of the Policy.

30. If Capital Concepts becomes subject to a judgment that it is liable to HSM, Arch will have an obligation to indemnify Capital Concepts on that judgment and, should it fail to do so, will be not only in breach of its obligations under the Policy, but will be acting in bad faith.

**WHEREFORE**, the Plaintiff prays the Court that:

a.  For a declaratory judgment, declaring that Plaintiff if an insured under the Policy and that the Defendant is obligated to provide a defense for the Plaintiff in the Underlying Litigation and to indemnify the plaintiff in the event of an adverse outcome in that case;

b.  For an award of any damages as may be proven at trial, including defense costs incurred in defending the Underlying Litigation;

c.  It recover its costs and expenses in this action, including attorney's fees as allowed by law;

d.  It receive a trial by jury on all issues so triable; and

e.  It recover all such other relief as the Court deems appropriate.

This the 30th day of May, 2018.

Michael P. Thomas
N.C. State Bar No. 28122
MThomas@phd-law.com
Patrick, Harper & Dixon, LLP
P.O. Box 218
Hickory, North Carolina 28603
(828) 322-7741
Mthomas@phd-law.com
*Attorney for Plaintiff*

STATE OF NORTH CAROLINA

COUNTY OF CATAWBA

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

FILED  18-CVS-__158__

2018 JAN 19 P 1: 12

CATAWBA CO., C.S.C.

BY_____

HICKORY SPRINGS MANUFACTURING
COMPANY,

        Plaintiffs,

v.

THE PENN MUTUAL LIFE INSURANCE
COMPANY, THE PENN INSURANCE AND
ANNUITY COMPANY, ROBERT V.
DONOVAN, CAPITAL CONCEPTS, LLC,
and COMPENSATION CONSULTANTS, LLC

        Defendants.

**COMPLAINT**

2018 MAY 30 P 2: 51

CATAWBA CO., C.S.C.

BY

FILED

        Plaintiff Hickory Springs Manufacturing Company ("Plaintiff"), complaining of Defendants The Penn Mutual Life Insurance Company and The Penn Insurance and Annuity Company (collectively, "Penn Mutual"), Robert V. Donovan ("Donovan"), Capital Concepts, LLC ("Capital Concepts"), and Compensation Consultants, LLC ("Compensation," collectively, "Defendants"), alleges and states:

## PARTIES, JURISDICTION AND VENUE

    1.    Plaintiff is a corporation organized and existing under the laws of the state of North Carolina, with its principal place of business in Catawba County, North Carolina.

    2.    Upon information and belief, The Penn Mutual Life Insurance Company is a corporation incorporated under the laws of Pennsylvania, and is licensed with the North Carolina Department of Insurance to sell insurance within North Carolina.

    3.    Upon information and belief, The Penn Insurance and Annuity Company is a corporation incorporated under the laws of Delaware, and is licensed with the North Carolina Department of Insurance to sell insurance within North Carolina.

{00308356 v 1 }

EXHIBIT

A

4.      Upon information and belief, Defendant Donovan is an individual, not under any disability, who is a citizen and resident of the Avery County, North Carolina.

5.      Upon information and belief, Defendant Capital Concepts is a limited liability company organized and existing under the laws of the state of North Carolina, with its principal place of business in Catawba County, North Carolina.

6.      Upon information and belief, Donovan was, at all times relevant, a member and manager of Capital Concepts.

7.      Upon information and belief, Defendant Compensation is a limited liability company organized and existing under the laws of the state of North Carolina, with its principal place of business in Catawba County, North Carolina.

8.      Upon information and belief, Donovan was, at all times relevant, a member and manager of Compensation, and acted as an agent of Compensation.

9.      Upon information and belief, Donovan was, at all times relevant, acting as an agent of Penn Mutual in soliciting Plaintiff to purchase Penn Mutual insurance policies as described below.

10.     Donovan has at all times since June 2007 been an appointed insurance agent for Penn Mutual with the North Carolina Department of Insurance.

11.     This Court has jurisdiction over the parties and subject matter of this action.

12.     Venue is proper in this judicial district.

## FACTUAL BACKGROUND

13.     Donovan holds himself out as an expert in life insurance and executive benefits. Donovan has sold insurance products to shareholders and officers of Plaintiff for over 20 years, and has designed executive compensation plans for and sold insurance products to Plaintiff for a number of years.

Case 5:18-cv-00104-MOC-DSC   Document 1-1   Filed 07/01/18   Page 7 of 87

14.    Plaintiff justifiably reposed its trust and confidence in Donovan as its exclusive advisor on matters involving life insurance and deferred benefit planning.

15.    In May 2012, Donovan, individually and on behalf of Capital Concepts and Compensation, and while acting as an agent of Penn Mutual, proposed that Plaintiff adopt a Supplemental Executive Retirement Plan ("SERP") which would be informally "funded" by life insurance policies sold by Donovan covering the lives of the executives receiving the benefits.

16.    Donovan explained to Plaintiff that a SERP is an award of deferred post-employment compensation made to certain key executives that typically vests in the executive based upon service requirements.

17.    In May 2012, Donovan delivered a presentation to Plaintiff's compensation committee in which he detailed a proposed SERP program to be adopted for ten (10) of Plaintiff's key executives.

18.    Under the proposed SERP program, ten (10) participants would be awarded total retirement benefits of $21,700,000 paid out in annual installments for ten (10) years after termination of their employment, with varying installment payments for each participant. The executive with the largest award was to receive $500,000 annually for ten (10) years.

19.    To informally fund the SERP payments, Donovan proposed that Plaintiff purchase Penn Mutual life insurance policies on the participants, and that Plaintiff would pay premiums on the life insurance and build value in each policy until the insured executive's forecast retirement date.

20.    Donovan represented that the insurance policies would also gain value through a variable investment component indexed to capital markets, and that by the time the executives retired, Plaintiff would have built enough value in the policies to take loans from the policies to

Case 5:18-cv-00104-MOC-DSC   Document 1-1   Filed 07/01/18   Page 8 of 87

pay net SERP benefits, yet still maintain net death benefit sufficient to reimburse the Plaintiff for its initial premium outlays.

21.    Donovan represented that the proposed SERP plan, including the funding mechanism, would be "cost-neutral" to Plaintiff and would return a gain to the Plaintiff at plan conclusion.

22.    In connection with the presentation, Donovan delivered composite illustrations that were prepared by Penn Mutual which demonstrated how the proposed life insurance would operate, but did not deliver underlying policy illustrations or any information necessary to an understanding of the very complex financial contracts he proposed: Flexible Premium Universal Indexed Life Insurance policies.

23.    Donovan's representations about using these insurance policies as a funding mechanism to create "cost-neutrality" and a gain to Plaintiff at plan conclusion were expressly stated in the presentation given to the compensation committee and embodied in the Penn Mutual composite illustrations that accompanied the presentation.

24.    The composite illustrations presented by Donovan were created by Penn Mutual.

25.    Upon information and belief, Penn Mutual knew the purpose for which it created the composite illustrations was to allow Donovan to present the composite illustrations to Plaintiff for the purpose of selling Plaintiff Penn Mutual insurance policies.

26.    Unknown to Plaintiff at the time of the presentation, Donovan's representations and Penn Mutual's composite illustrations were significantly misleading, if not false, because of unreasonable underlying assumptions, failure to disclose any of the risks inherent in the complex policies, failure to distinguish guaranteed from non-guaranteed elements, and failure to consider the present value of future projected benefits.

27.     Penn Mutual's composite illustrations presented to Plaintiff by Donovan were based upon the assumption that the insurance policies would earn an investment gain at a rate greater than the variable interest rate Plaintiff would pay on loans on the policies; therefore, Plaintiff could borrow money from the policies without ever affecting the amount of investment gain. Those assumptions were not reasonable when made and seriously misrepresented the actual effect of using policy loans to fund benefits.

28.     Moreover, the composite illustrations created by Penn Mutual and delivered by Donovan to the compensation committee include the footnote that "[t]his Supplemental Illustration is not valid unless accompanied by the Basic Life Insurance Illustrations dated 05/31/2012 which include both Guaranteed and Non-Guaranteed elements and other important information about the Life Insurance Policy."   Basic Life Insurance Illustrations dated 05/31/2012 were never delivered to the Plaintiff; if they had been they would have disclosed that the investment returns portrayed in the composite illustration were not guaranteed, that the assumed rate of return underlying the composite illustrations was very high, and that using a more reasonable set of interest rate and investment return assumptions would have shown that these insurance policies were not sufficient to make Plaintiff's program "cash neutral" or realistically forecast to realize a "gain".

29.     Using the guaranteed return assumptions or a more reasonable rate of return, Plaintiff would be forced to incur significant interest costs in connection with taking loans from the policies, would run a significant risk of having to pay benefits from cash flow, and would risk exhausting all value in the policy and lapse of the policy prior to the participant's death.

30.     Upon information and belief, insurance regulations now prohibit the methodology used by Donovan and Penn Mutual to create the composite illustrations.

31. The Basic Life Insurance Illustrations dated 05/31/2012, if they were ever created, were not delivered to Plaintiff in connection with the composite illustrations or at any time before Plaintiff bought the insurance policies from Penn Mutual.

32. Donovan based his projection on the assumption that Plaintiff would be paying taxes at a marginal rate of 40.00%. Given that SERP benefits are tax-deductible by Plaintiff, Donovan projected that Plaintiff would receive tax deductions that would offset 40% of its payment of SERP benefits. However, at the time, Donovan knew or should have known that Plaintiff would not realize tax savings at a marginal rate of 40%.

33. Donovan created and presented composite illustrations which analyzed the plan in the aggregate with all 10 participants considered together. However, Donovan knew that each participant would receive different benefits and would have a separate Rabbi trust to hold the insurance policy on his life.

34. Donovan and Penn Mutual knew or should have known that certain individual policies would not be capable of completely funding the individual benefits of that insured, but neither even disclosed that fact to the Plaintiff.

35. The participant who would receive the largest SERP benefit had only been employed full-time with Plaintiff for approximately six months at the time Donovan made his presentation to the compensation committee. Moreover, that executive was a member of the compensation committee. Given that this executive would receive the largest SERP award, Donovan proposed that Plaintiff purchase the largest insurance policy on his life, a $5 million policy.

36. As stated above, analyzing the specific participant and policy in isolation, Donovan knew or should have known that Plaintiff could not build enough value in the policy prior to the participant's retirement to fund the net SERP benefits and that there was a great risk

Case 5:18-cv-00104-MOC-DSC   Document 1-1   Filed 07/01/18   Page 11 of 87

that Plaintiff would exhaust all value in the policy prior to the participant's death, denying Plaintiff any death benefit whatsoever.

37.     Upon information and belief, Donovan proposed that the Plaintiff take out the largest policy on this participant when he knew, or should have known, that the policy could not fund the award as intended.

38.     In reliance upon Donovan's representations, Plaintiff adopted the proposed SERP program and purchased eight (8) Flexible Premium Adjustable Universal Indexed Life Insurance Policies issued by Penn Mutual Insurance Company for which Donovan served as agent. Donovan and Penn Mutual never disclosed to Plaintiff that the policies actually purchased were not consistent with the composite illustrations – which was the only illustration Donovan ever presented to Plaintiff. The insurance policies were placed in individual Rabbi trusts for the purpose of informally funding the SERP plan Plaintiff had adopted, based on Donovan's representations regarding the insurance policies' ability to "fund" Plaintiff's obligations.

39.     Upon information and belief, Donovan, Capital Concepts and Compensation received significant compensation, in the form of commissions, for selling the Penn Mutual life insurance policies.

40.     Penn Mutual has, to date, received millions of dollars of premium payments from Plaintiff for the insurance policies.

41.     Plaintiff incurred substantial liabilities to the company in reliance on Defendants' express representations that the life insurance policies would serve as a cash-neutral funding mechanism to pay for these new liabilities, and would in fact ultimately result in a gain to Plaintiff.

42.     Among the facts which were never provided to the Plaintiff's Compensation Committee or Board was the fact that Donovan would not provide any insurance product to fund

Case 5:18-cv-00104-MOC-DSC   Document 1-1   Filed 07/01/18   Page 12 of 87

the SERP benefit or provide death benefit to the Plaintiff for one of the participants; instead he had Plaintiff place two (2) company owned life insurance policies on the life of that participant -- that it had purchased many years before -- in a Rabbi trust, thus concealing some of the adverse effects of adopting the SERPs.

43.     In 2015, Plaintiff discovered that the SERP program was not cash-neutral and that there was a significant risk that Plaintiff will lose in the end.  The insurance policies sold by Donovan for the purpose of covering the Plaintiff's obligations were not sufficient to pay Plaintiff's obligations.

44.     Plaintiff entered into a tolling agreement with Penn Mutual that remains in place as of the date of this Complaint and which, as amended, tolled the expiration of any limitation periods as of September 19, 2016.

45.     Plaintiff entered into a tolling agreement with Donovan, Capital Concepts, and Compensation that remains in place as of the date of this Complaint and which, as amended, tolled the expiration of any limitation periods as of October 3, 2016.

## FIRST CLAIM FOR RELIEF
### (Unfair and Deceptive Trade Practices – All Defendants)

46.     Plaintiff realleges and incorporates by reference the foregoing allegations.

47.     Defendants committed an unfair or deceptive act or practice by, among other things described above, selling insurance policies to Plaintiff using false and misleading information including the false and misleading composite illustrations created by Penn Mutual, which information was relied upon by Plaintiff in entering into the insurance transaction, in violation of N.C. Gen. Stat. § 58-63-15(1), and § 75-1.1, *et seq*.

48.     Defendants' conduct was in or affecting commerce.

49.     Defendants' unfair or deceptive act or practice proximately caused damage to Plaintiff in an amount to be determined at trial.

{00308356 v 1 }                                     8

50.     By reason of the foregoing, Plaintiff is entitled to recover from Defendants compensatory in an amount to be determined at trial but in any event in excess of $25,000, its reasonable attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1, and, at its election, treble or punitive damages.

**SECOND CLAIM FOR RELIEF**
(Breach of Fiduciary Duty – Donovan, Capital Concepts, Compensation)

51.     Plaintiff realleges and incorporates by reference the foregoing allegations.

52.     Plaintiff reposed its trust and confidence in Defendants Donovan, Capital Concepts, and Compensation with respect their business of selling insurance and employment compensation products.

53.     Defendants Donovan, Capital Concepts, and Compensation owed Plaintiff a fiduciary duty.

54.     Defendants Donovan, Capital Concepts, and Compensation breached this fiduciary duty by failing to inform Plaintiff of the actual costs and risks associated with adopting the funding mechanism for the proposed SERP plan, including, but not limited to, by making unreasonable assumptions, by failing to present Plaintiff with the Basic Life Insurance Illustrations dated 05/31/2012, and by failing to analyze each participant and policy separately.

55.     As a direct and proximate result of Defendants Donovan, Capital Concepts, and Compensation's misconduct, Plaintiff has been damaged in an amount to be determined at trial.

56.     By reason of the foregoing, Plaintiff is entitled to recover from Defendants Donovan, Capital Concepts, and Compensation compensatory and punitive damages in an amount to be determined at trial but in any event in excess of $25,000.

**THIRD CLAIM FOR RELIEF**
(Constructive Fraud – all Defendants)

57.     Plaintiff realleges and incorporates by reference the foregoing allegations.

{00308356 v 1 }

9

Case 5:18-cv-00104-MOC-DSC   Document 1-1   Filed 07/01/18   Page 14 of 87

58.     A confidential or fiduciary relationship existed between Plaintiff and Defendants Donovan, Capital Concepts, and Compensation as a result of Defendants Donovan, Capital Concepts, and Compensation's position of trust and confidence.

59.     Defendant Donovan was acting as an agent of Penn Mutual, and Penn Mutual is liable for Donovan's acts taken within the scope of Donovan's agency.

60.     Defendants Donovan, Capital Concepts, and Compensation exploited their position of trust and confidence by persuading Plaintiff to purchase insurance policies as a cash neutral mechanism to fund the proposed SERP without informing Plaintiff of the actual costs and risks, including, but not limited to, by making unreasonable assumptions, misrepresenting the actual costs to Plaintiff, by failing to present Plaintiff with the individual Basic Life Insurance Illustrations dated 05/31/2012, and by failing to analyze each participant and policy separately.

61.     Defendants gained a benefit from their abuse of the confidential or fiduciary relationship.

62.     As a direct and proximate result of Defendants' constructive fraud, Plaintiff has been damaged in an amount to be determined at trial, but in any event, in excess of $25,000.

### FOURTH CLAIM FOR RELIEF
#### (Fraudulent Inducement – All Defendants)

63.     Plaintiff realleges and incorporates by reference the foregoing allegations.

64.     Plaintiff entered into insurance contracts with Penn Mutual described above.

65.     As described above, Penn Mutual, through its agent Donovan and in its composite illustrations delivered to Plaintiff, fraudulently misrepresented the costs, performance, and assumptions underlying the insurance contracts.

66.     Penn Mutual had a duty to provide Plaintiff with true and accurate information regarding the costs, performance, and assumptions underlying the insurance contracts.  Penn Mutual, and its agent Donovan, knew or should have known that the information it provided to

Case 5:18-cv-00104-MOC-DSC   Document 1-1   Filed 07/01/18   Page 15 of 87

Plaintiff the costs, performance, and assumptions underlying the insurance contracts was false or omitted information necessary to make the information not false and misleading, and upon information and belief provided the information to induce Plaintiff to enter into the insurance contracts that would result in Penn Mutual being paid millions of dollars in premiums by Plaintiffs.

67.     Plaintiff reasonably relied upon the representations by Penn Mutual in entering into the insurance contracts. Plaintiff would not have entered into the insurance contracts if Penn Mutual had presented to Plaintiff true and accurate information about the costs, performance and assumptions underlying the insurance contracts.

68.     Plaintiff could not have discovered the truth, or was persuaded by Penn Mutual and its agent not to discover the truth.

69.     As a direct and proximate result of Penn Mutual's misrepresentations, Plaintiff has been damaged in an amount to be determined at trial, but in any event, in excess of $25,000.

70.     In the alternative, Plaintiff is entitled to rescind the insurance contracts and be placed in the position it was prior to the entry of the insurance contracts with Penn Mutual.

## FIFTH CLAIM FOR RELIEF
### (Negligent Misrepresentation – All Defendants)

71.     Plaintiff realleges and incorporates by reference the foregoing allegations.

72.     In the alternative, Plaintiff entered into insurance contracts with Penn Mutual described above.

73.     As described above, Penn Mutual, through its agent Donovan and in its composite illustrations delivered to Plaintiff, negligently misrepresented the costs, performance, and assumptions underlying the insurance contracts.

74.     Penn Mutual had a duty to provide Plaintiff with true and accurate information regarding the costs, performance, and assumptions underlying the insurance contracts. Penn

Mutual, and its agent Donovan, knew or should have known that the information it provided to Plaintiff about the costs, performance, and assumptions underlying the insurance contracts was false, or provided the information with reckless disregard to its truth or falsity, and upon information and belief provided the information to induce Plaintiff to enter into the insurance contracts that would result in Penn Mutual being paid millions of dollars in premiums by Plaintiffs.

75.    Plaintiff reasonably relied upon the representations by Penn Mutual in entering into the insurance contracts. Plaintiff would not have entered into the insurance contracts if Penn Mutual had presented to Plaintiff true and accurate information about the costs, performance and assumptions underlying the insurance contracts.

76.    Plaintiff could not have discovered the truth, or was persuaded by Defendants not to discover the truth.

77.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff has been damaged in an amount to be determined at trial, but in any event, in excess of $25,000.

**WHEREFORE,** Plaintiff respectfully prays the Court for the following:

A.    That Plaintiff be awarded its actual damages against Defendants, jointly and severally;

B.    That the insurance contracts between Plaintiff and Penn Mutual be rescinded and the parties be returned to the status quo ante;

C.    That the Court award treble damages against Defendants, pursuant to N.C. Gen. Stat. §§ 75-16;

D.    That Plaintiff be awarded its reasonable attorneys' fees to the full extent allowable by law;

E.    That the costs of this action be taxed against Defendants;

{00308356 v 1 }                                    12

F.      For a trial by jury on the above causes of action; and

G.      For such other and further relief as the Court deems just and proper.


This the 19th day of January, 2018.

                                        RAYBURN  COOPER  &  DURHAM, P.A.

                                        By: _____
                                            C. Richard Rayburn Jr.
                                            N.C. State Bar No. 6357
                                            Ross R. Fulton
                                            N.C. State Bar No. 31538
                                            227 West Trade Street, Suite 1200
                                            Charlotte, NC  28202
                                            (704) 334-0891 (tel.)
                                            (704) 377-1897 (fax)
                                            rrayburn@rcdlaw.net
                                            rfulton@rcdlaw.net

                                            *Attorneys for Plaintiff*


# Arch
## Insurance Group

FILED

## ARCH INSURANCE COMPANY
### A Missouri Corporation

2016 MAY 30 P 2: 51

CA INES

BY _____

ADMINISTRATIVE OFFICE
One Liberty Plaza
53rd Floor
New York, NY 10006
Tel: 800-817-3252

HOME OFFICE
3100 Broadway, Suite 511
Kansas City, MO 64111

### COMPANY SPONSORED LIFE INSURANCE AGENTS ERRORS AND OMISSIONS POLICY

**THIS IS A CLAIMS MADE AND REPORTED POLICY AND, SUBJECT TO ITS PROVISIONS, APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE INSURER IN WRITING DURING THE POLICY PERIOD UNLESS AN EXTENDED REPORTING PERIOD APPLIES.**

**PLEASE READ THE ENTIRE POLICY CAREFULLY.**

## DECLARATIONS

Insurance is provided by: ARCH INSURANCE COMPANY

Policy No.     CAP0050281 04                    Renewal of:     CAP0050281 03

| Item 1. | Sponsoring Company: | AMERITAS LIFE INSURANCE CORP. & SUBSIDIARIES, MEMBERS OF THE FINANCIAL SALES PROFESSIONALS PURCHASING GROUP |
|---|---|---|
| | Mailing Address: | P.O. BOX 81889<br>5900 "O" STREET<br>LINCOLN, NE 68501 |
| Item 2. | First Named Insured: | AMERITAS LIFE INSURANCE CORP. & SUBSIDIARIES, MEMBERS OF THE FINANCIAL SALES PROFESSIONALS PURCHASING GROUP |
| | Mailing Address: | P.O. BOX 81889<br>5900 "O" STREET<br>LINCOLN, NE 68501 |
| Item 3. | Policy Period: | From: JULY 1, 2016  To: JULY 1, 2017<br>12:01 a.m. local time at the address shown in Item 1 |

Item 4.     Limits of Liability:

| | | |
|---|---|---|
| Option 1. | $1,000,000 | Each Claim |
| | $2,000,000 | Aggregate Each Agent for the Policy Period |
| Option 2. | $2,000,000 | Each Claim |
| | $3,000,000 | Aggregate Each Agent for the Policy Period |
| Broker/Dealer: | Ameritas Investment Corp.: | |
| | $1,000,000 | Each Claim |

EXHIBIT

B

05 CAPD001 00 04 03

Page 1 of 2

|            |             | $5,000,000 | Aggregate |

| Item 5. | Deductible: | $1,000.00 | each Claim each Agent for Company Sponsored insurance products; |
|         |             | $2,500.00 | each Claim each Agent for all other covered insurance products; |
|         |             | $5,000.00 | each Claim each Registered Representative for all securities processed through and approved by Ameritas Investment Corp.; |
|         |             | $5,000.00 | each Claim for the Broker/Dealer Entity (Ameritas Investment Corp.) |

Item 6.    Option 1: Life/Health only

        $1,000,000/$2,000,000: $1,278
        $2,000,000/$3,000,000: $1,584

   Option 2: Life/Health and Series 6 products

        $1,000,000/$2,000,000: $1,535
        $2,000,000/$3,000,000: $1,841

   Option 3: Life/Health, Series 6 & 7 products

        $1,000,000/$2,000,000: $1,832
        $2,000,000/$3,000,000: $2,250

- Retired Agents (Emeritus) will be charged 50% of the active agent rate

Item 7.    Deposit Premium: $500,000.00

Item 8.    Endorsements Effective at Inception: See Attached Schedule of Forms and Endorsements

# SCHEDULE OF FORMS AND ENDORSEMENTS

| | |
|---|---|
| **NAMED INSURED:** Ameritas Life Insurance Corp. & Subsidiaries | TERM: 07/01/2016 – 07/01/2017 |
| **POLICY NUMBER:** CAP0050281 04 | |

| ENDT. NO. | FORM NO. | TITLE |
|---|---|---|
| | 05 CAPD001 00 04 03 | COMPANY SPONSORED LIFE INSURANCE AGENTS ERRORS AND OMISSIONS POLICY |
| | 05 ML0002 00 12 14 | SIGNATURE PAGE |
| | 05 ML0014 00 03 03 | CLAIMS HANDLING PROCEDURES |
| | 00 ML0065 00 06 07 | U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS |
| 1 | 00 ML0003 00 08 07 | SERVICE OF SUIT |
| 2 | 00 CAP0004 28 06 04 | NEBRASKA STATE AMENDATORY ENDORSEMENT |
| 3 | 00 ML207 00 11 03 | BROKER/DEALER ENTITY ENDORSEMENT |
| 4 | 00 ML0207 00 11 03 | SUPPLEMENTARY PAYMENTS AMENDATORY ENDORSEMENT |
| 5 | 00 ML0207 00 11 03 | AMENDATORY ENDORSEMENT |
| 6 | 00 ML0207 00 11 03 | INDEPENDENT REGISTERED INVESTMENT ADVISER COVERAGE ENDORSEMENT |
| 7 | 00 ML0207 00 11 03 | AMEND LIFE SETTLEMENTS AND OPTIONS EXCLUSION – SUBLIMIT AMENDATORY ENDORSEMENT |
| 8 | 00 ML0207 00 11 03 | AMENDMENT TO RETROACTIVE DATE ENDORSEMENT |
| 9 | 00 ML0207 00 11 03 | AMENDMENT OF PROFESSIONAL SERVICES (DELETION OF SECURITIES COVERAGE) ENDORSEMENT – OPTION 1 |
| 10 | 00 ML0207 00 11 03 | SECURITIES PRODUCTS ENDORSEMENT – OPTION 2 |
| 11 | 00 ML0207 00 11 03 | SPECIFIC PRODUCT EXCLUSION ENDORSEMENT |
| 12 | 00 ML0207 00 11 03 | TERMINATED AGENTS ENDORSEMENT |
| 13 | 00 ML0207 00 11 03 | TRADE ERRORS OR COST OF CORRECTIONS ENDORSMENT |
| 14 | 00CAP0130 00 04 16 | NETWORK SECUIRTY BREACH & PRIVACY COVERAGE |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# COMPANY SPONSORED LIFE INSURANCE AGENTS
## ERRORS AND OMISSIONS POLICY

**THIS IS A CLAIMS MADE AND REPORTED POLICY AND, SUBJECT TO ITS PROVISIONS, APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE INSURER IN WRITING DURING THE POLICY PERIOD UNLESS AN EXTENDED REPORTING PERIOD APPLIES.**

### PLEASE READ THE ENTIRE POLICY CAREFULLY.

In consideration of the payment of premium and in reliance upon the statements in the **Application** which is made a part hereof and incorporated by reference and subject to the Declarations, terms, conditions and exclusions in this Policy, the Insurer indicated in the Declarations and the **Insureds** agree as follows:

I.    INSURING AGREEMENTS

    A.    Professional Liability

        The Insurer shall pay on behalf of the **Insured** all **Loss** which the **Insured** shall become legally obligated to pay because of a **Claim** first made against the **Insured** during the **Policy Period** or an Extended Reporting Period, if applicable, for a **Wrongful Act** committed on or after the **Retroactive Date** by the **Insured** solely in the rendering or failing to render **Professional Services**.

    B.    Wrongful Supervision or Termination

        The Insurer shall pay on behalf of the **Agent Manager** all **Loss** which the **Agent Manager** shall become legally obligated to pay because of a **Claim** first made against the **Agent Manager** during the **Policy Period** or an Extended Reporting Period, if applicable, for a **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** by an **Agent Manager** solely in the rendering or failing to render **Professional Services**.

    C.    Vicarious Liability

        The Insurer shall pay on behalf of the **Sponsoring Company** all **Loss** which the **Sponsoring Company** shall become legally obligated to pay because of a **Claim** first made during the **Policy Period** or an **Extended Reporting Period**, if applicable, solely arising out of a **Wrongful Act of an Agent** committed on or after the **Retroactive Date** solely in the rendering or failing to render **Professional Services**. The **Wrongful Act** must be attributable solely to an **Agent** in the rendering or failing to render **Professional Services** and not due to any actual or alleged independent wrongdoing or bad faith of the **Sponsoring Company**. If a **Claim** made against the **Sponsoring Company** includes both covered and uncovered allegations, the **Sponsoring Company** and the **Insurer** agree to use their best efforts to agree upon a fair and proper allocation of the payment of **Loss** and **Defense Costs** for such **Claim**.

II.    DEFENSE AND SETTLEMENT

    The Insurer shall have the right and duty to defend any **Claim** against the **Insured** seeking sums payable under this Policy, even if the allegations of the **Claim** are groundless or false. The Insurer shall make such investigation and settlement of any **Claim** as it deems expedient, but the Insurer shall not be obligated to pay any **Claim** or judgment or continue to defend any **Claim** after the applicable Limit of Liability has been exhausted by payment of **Loss**.

III.    DEFINITIONS

For purposes of this Policy:

A.    **Agent** means an individual who:

      1.    maintains an agent or general agent contract with the **Sponsoring Company**;

      2.    has elected to enroll for coverage under this Policy and whose enrollment is on file with the **Sponsoring Company**;

      3.    has paid his or her premium;

      4.    is licensed by the appropriate authorities to solicit and sell life, accident and health insurance products and services; and

      5.    when required in rendering **Professional Services**, is properly registered as a registered representative with the National Association of Securities Dealers.

B.    **Agent Contract** means the contract between an **Agent** and the **Sponsoring Company**.

C.    **Agent Manager** means **Insureds** as defined in Section III. I. 1 and 2.

D.    **Application** means all signed applications and any attachments and materials submitted therewith for this Policy and for any policy in an uninterrupted series of policies issued by the Insurer or any Affiliate of the Insurer of which this Policy is a renewal or replacement. An "Affiliate of the Insurer" is an insurer controlling, controlled by or under common control with the Insurer.

E.    **Broker/Dealer** means an entity acting as a "broker" or "dealer" in **Securities** as those terms are defined in sections 3(a)(4) and 3 (a)(5) of the Securities Exchange Act of 1934, and any amendments thereto.

F.    **Claim** means:

      1.    a written demand for monetary damages received by an **Insured**;

      2.    a civil proceeding commenced by the service of a complaint or similar pleading in which monetary damages are sought; or

      3.    an arbitration commenced by the filing of the statement of claim in which monetary damages are sought;

including any appeal from the proceedings identified in paragraphs 2 and 3 above. **Claim** does not include a demand or proceeding for non-monetary or injunctive relief or any administrative or criminal proceeding.

G.    **Defense Costs** mean reasonable and necessary fees, costs and expenses incurred by or at the direction of the Insurer in the defense of a **Claim** and the premium for appeal, attachment or similar bonds. The Insurer shall have no obligation to apply for or provide such bonds. **Defense Costs** shall not include regular or overtime wages, salaries, or fees of directors, officers, and employees of the **Insured** or Insurer or fees and expenses of independent adjusters.

H.   **First Named Insured** means the insurance company listed in Item 2 of the Declarations and listed as the **Sponsoring Company** in Item 1 of the Declarations.

I.   **Insured** means:

1.   an **Agent**;

2.   a corporation, partnership or other business entity owned and controlled by an **Agent** but solely with respect to the liability of such organization as it arises out of the **Agent** rendering or failing to render **Professional Services**;

3.   an employee acting in his or her capacity as such and on behalf of an **Agent** but solely with respect to liability of such employee as it arises out of the **Agent** rendering or failing to render **Professional Services**;

4.   heirs, executors, administrators or legal representatives of an **Agent** in the event of death, incapacity or bankruptcy;

5.   the **Sponsoring Company** but only with respect to coverage provided under Section I. C.; and

6.   any Neophyte Agent of the **Sponsoring Company** provided that they are party to an agent contract with the **Sponsoring Company** on the effective date of this policy and provided that they are licensed by the appropriate authorities to solicit and sell products and/or services made available by the **Sponsoring Company.** Such individuals shall be specifically designated by name and their names shall be on file with the **Sponsoring Company.** Any new Neophyte Agent of the **Sponsoring Company** who shall become party to an agent contract with the **Sponsoring Company** after the effective date of this Policy shall become an **Insured** upon the effective date of such contract.

J.   **Loss** means monetary judgments, awards or settlements that an **Insured** is legally obligated to pay on account of a covered **Claim. Loss** shall include fees, charges, taxes, fines or penalties incurred by a claimant and included in such claimant's **Claim** against the **Insured. Loss** does not include:

1.   civil or criminal fines or penalties imposed by law;

2.   punitive, exemplary or the multiple portion of a multiplied damage award;

3.   the return or withdrawal of fees, commissions or charges;

4.   costs incurred as a result of any non-pecuniary or injunctive relief;

5.   matters which are deemed uninsurable by law;

6.   any amounts constituting a waiver of fees, charges, costs or any other monetary amounts the **Sponsoring Company** is contractually entitled to impose upon a customer; or

7.   **Defense Costs.**

K.   **Multiple Employer Welfare Arrangement** shall have the same meaning as the term used by the Employee Retirement Income Security Act of 1974, and any amendments thereto. **Multiple Employer Welfare Arrangement** does not include an arrangement

where the direct contract for providing benefits is between the recipient of the benefit and an insurance company: (1) recognized as an admitted insurer by the insurance regulatory agency in the applicable state or jurisdiction; and (2) appropriately licensed to provide the coverage in the state or jurisdiction where the coverage is in force.

L.   **Personal Injury** means injury or damage arising out of:

1. false arrest, detention or imprisonment;

2. malicious prosecution; or

3. libel or slander or other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy. However, there shall be no coverage for any such publication or utterance made in the course of or related to any form of advertising activities conducted by or on behalf of an **Insured**.

M.   **Policy Period** shall mean the period stated in Item 3 of the Declarations, or any earlier termination or cancellation date of this Policy.

N.   **Professional Services** means:

1. the solicitation, sale or servicing of:

   a. life insurance, accident and health insurance, long-term care insurance, workers' compensation insurance as part of a 24-hour accident and health insurance product, disability income insurance or fixed annuities;

   b. variable annuities, flexible and scheduled premium annuities and variable life insurance;

   c. mutual funds registered with the Securities and Exchange Commission and sold or serviced through a **Broker/Dealer** that is a member of the National Association of Securities Dealers; and

   d. **Securities** (other than variable annuities, variable life insurance and mutual funds) that were authorized or approved by the **Broker/Dealer** subsidiary of the **Sponsoring Company** or that were processed through the **Broker/Dealer** subsidiary of the **Sponsoring Company**;

2. the solicitation, sale or administration of employee benefit plans, other than **Multiple Employer Welfare Arrangements**, including group plans, group or ordinary pension or profit sharing plans, retirement annuities, and life, accident and health or disability plans;

3. financial planning, advice and consultation solely in connection with any of the products listed in paragraphs 1 and 2 above; and

4. providing services as a notary public.

O.   **Related Claims** means all **Claims**, whether made against more than one **Insured** or by more than one claimant, arising out of a single **Wrongful Act** or **Wrongful Supervision or Termination Act** or a series of **Wrongful Acts** or **Wrongful Supervision or Termination Acts** that have as a common nexus any fact, circumstance, situation, event,

transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

P.  **Retroactive Date** means the inception date of the **Agent's** first claims-made life insurance agents professional liability policy from which date coverage has been maintained in force without interruption. The **Retroactive Date** for the **Sponsoring Company** and **Insureds** defined in Section III. I. 2 through 4 shall be the same as applicable to the **Agent** whose **Wrongful Act** or **Wrongful Supervision or Termination Act** gave rise to the **Claim** or the **Agent** who is responsible for the **Wrongful Act** or **Wrongful Supervision or Termination Act** of such other **Insureds**.

Q.  **Securities** shall have the same meaning as the term used by the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, or the Investment Advisors Act of 1940, and any amendments thereto.

R.  **Sponsoring Company** means the **First Named Insured** and the insurance company listed in Item 1 of the Declarations and any **Subsidiaries**.

S.  **Subsidiary** means a corporation in which the **Sponsoring Company** listed in Item 1 of the Declarations:

  1.  owns as of the inception date of the **Policy Period** more than fifty percent (50%) of the issued and outstanding voting stock either directly or indirectly through one or more of its **Subsidiaries** and which corporation is engaged in **Professional Services**; or

  2.  forms or acquires on or after the inception date of the **Policy Period**, if the **Sponsoring Company** listed in Item 1 of the Declarations owns, directly or indirectly through one or more of its **Subsidiaries**, more than fifty percent (50%) of the issued and outstanding voting stock and which corporation is engaged in **Professional Services**. Such corporation is automatically covered as of the date of formation or acquisition if the number of agents of such corporation total less than twenty percent (20%) of the total number of **Agents** of the **Sponsoring Company** as of the inception date of the **Policy Period**. The **Sponsoring Company** shall provide the Insurer with full particulars of the new **Subsidiary** within ninety (90) days of the date of formation or acquisition.

T.  **Wrongful Act** means a negligent act, error or omission or **Personal Injury** committed by an **Insured.**

U.  **Wrongful Supervision or Termination Act** means a negligent, act, error or omission:

  1.  arising out of  the supervision and training of an agent contracted with the **Agent Manager**, but only with respect to **Wrongful Acts** of such agent which constitute covered **Professional Services**; or

  2.  arising out of the termination of the agency contract between an **Agent Manager** and an agent, provided, however, there shall be no coverage for discrimination as defined by federal, state or local statute, regulation, law or ordinance.

IV.  EXCLUSIONS

This Policy does not apply to any **Claim**:

A.    based upon, arising out of or in any way involving any fact, circumstance or situation which has been the subject of any written notice given under any policy of which this Policy is a direct or indirect renewal or replacement or which preceded this Policy;

B.    based upon, arising out of or in any way involving any act, error or omission occurring prior to the date of the **Agent's** initial enrollment as an **Insured** under this Policy or a previously issued policy by the Insurer if on the date of initial enrollment the **Agent** had knowledge of any act, error or omission which could reasonably be expected to result in a **Claim**;

C.    based upon, arising out of or in any way involving any prior or pending litigation against any **Insured** filed on or before the inception date of this Policy or under any other policy of which this Policy is a renewal, whichever is earlier, or the same or substantially the same fact, circumstance or situation underlying or alleged therein;

D.    based upon, arising out of or in any way involving any dishonest, fraudulent, criminal, malicious or purposeful act, error or omission committed by or at the direction of an **Insured**; however, notwithstanding the foregoing, the **Insured** shall be afforded a defense, subject to the terms of this Policy, until the allegations are subsequently proven by a final adjudication. In such event, the **Insured** shall reimburse the Insurer for all **Defense Costs** incurred by the Insurer;

E.    based upon, arising out of or in any way involving an **Insured** gaining, in fact, any profit, remuneration or pecuniary advantage to which the **Insured** was not legally entitled;

F.    based upon, arising out of or in any way involving a willful violation of the rules or regulations of the National Association of Securities Dealers, Securities and Exchange Commission, Securities Act of 1933, Securities Exchange Act of 1934, Investment Company Act of 1940, or the Investment Advisors Act of 1940 and any amendments thereto, or of any state securities statute or state regulatory agency;

G.    based upon, arising out of or in any way involving any commingling of or improper use of client funds;

H.    based upon, arising out of or in any way involving investment products partially or totally owned by the **Insured**;

I.    based upon, arising out of or in any way involving bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

J.    based upon, arising out of or in any way involving discrimination as defined by federal, state or local statute, regulation, law or ordinance;

K.    based upon, arising out of or in any way involving the liability of others assumed by the **Insured** under any contract or agreement unless such liability would have attached to the **Insured** even in the absence of such agreement;

L.    based upon, arising out of or in any way involving any pension, profit sharing, health and welfare, or other employee benefit plan or trust sponsored by the **Insured** as an employer;

M.    based upon, arising out of or in any way involving any professional services performed by the **Insured** as an actuary, accountant, attorney, real estate agent or real estate broker, property/casualty insurance agent or third party claims administrator; however, this

Exclusion shall not apply to tax advice incidental to the sale of products listed in Section III. N. 1 and 2;

N.     based upon, arising out of or in any way involving insolvency, receivership, conservatorship, liquidation, bankruptcy, inability or refusal to pay of any organization, entity or vehicle of any kind, nature or structure in which the **Insured** has placed, recommended to be placed or obtained coverage or in which an **Insured** has placed or recommended to be placed the funds of a client or account; however, this Exclusion shall not apply if such organization, entity or vehicle is an insurance company that was rated A- or better by A.M. Best at the time the **Insured** placed, recommended to be placed or obtained such coverage for a client in such insurance company or in which an **Insured** has placed such funds of a client or account;

O.     based upon, arising out of or in any way involving the **Insured's** inability or refusal to pay or collect premium, claim or tax monies;

P.     brought or maintained, directly or indirectly, by or on behalf of :

    1.     an **Insured**; however, this Exclusion shall not apply to a **Claim** covered under Section I. B;

    2.     any insurance company or **Broker/Dealer**;

    3.     any insurance agent or broker;

    4.     any individual or entity that is not a client of an **Insured**; however, this Exclusion shall not apply to a **Claim** brought by an individual or entity who is an alleged beneficiary or heir, executor or administrator of a deceased client of an **Insured;**

    5.     any enterprise that owns, operates, controls or manages an **Insured**;

    6.     an enterprise which an **Insured** owns, operates, controls or manages; or

    7.     any governmental or quasi-governmental official or agency in any capacity, including but not limited to the Securities and Exchange Commission, National Association of Securities Dealers, the Securities Investor Protection Corporation, or any state or federal securities or insurance commission or agency; however, this Exclusion shall not apply to a **Claim** brought by or on behalf of such official or entity in its capacity as a client of an **Insured**;

Q.     based upon, arising out of or in any way involving the use of confidential information by an **Insured**, including but not limited to such use for the purpose of replacement of coverage;

R.     based upon, arising out of or in any way involving the placement of a client's coverage or funds directly or indirectly with any organization, entity or vehicle of any kind, nature or structure which is not licensed to do business in the state or jurisdiction with authority to regulate such business; however, this Exclusion shall not apply to any **Claim** arising from or contributed to by the placement of a client's coverage or funds directly or indirectly with such organization, entity or vehicle which is an eligible surplus lines insurer in the state or jurisdiction with authority to regulate such business;

S.     based upon, arising out of or in any way involving the offering, sale or servicing of structured settlements; however, this Exclusion shall not apply to a **Claim** arising out of the selling or servicing of the underlying covered product;

T. based upon, arising out of or in any way involving the ownership, formation, operation, or administration of a health maintenance organization, preferred provider organization, captive, risk retention group, self-insurance program or purchasing group;

U. based upon, arising out of or in any way involving the placement of coverage with a **Multiple Employer Welfare Arrangement**;

V. based solely upon a loss alleged to have been sustained through fluctuation in market value of any security;

W. based upon, arising out of or in any way involving any **Securities** (other than variable annuities, variable life insurance and mutual funds) that were not authorized or approved by the **Broker/Dealer** subsidiary of the **Sponsoring Company** or **Securities** that were not processed through the **Broker/Dealer** subsidiary of the **Sponsoring Company**;

X. based upon, arising out of or in any way involving:

    1. any function of an **Insured** as a specialist or market maker for any **Securities**;

    2. an **Insured** failing to make a market for any **Securities**; or

    3. the purchase, sale or failure to purchase or sell **Securities** when the **Insured** is a specialist or market maker for such **Securities**;

Y. based upon, arising out of or any way involving any activities in connection with any equity security priced under five US dollars (US $5.00) at the time of purchase; however, this Exclusion shall not apply if the security is: (1) registered or approved for registration upon notice of issuance on a national exchange; (2) authorized or approved for authorization upon notice of issuance, for quotation in the NASDAQ system; or (3) issued by an investment company registered under the Investment Company Act of 1940 and any amendments thereto. For the purposes of this Exclusion, any equity security which is listed on the NASDAQ bulletin board or pink sheets shall not be considered approved for authorization upon notice of issuance for quotation in the NASDAQ system;

Z. based upon, arising out of or in any way involving the purchase, sale or the giving of advice regarding promissory notes, viatical or life settlements or any **Security** backed by viatical settlements, commodities, commodity future contracts, or option contracts other than covered call options; or

AA. based upon, arising out of or in any way involving the purchase, sale, or the giving of advice regarding "junk bonds" or "high yield bonds" unless they are approved by Ameritas Investment Corp., placed through Ameritas Investment Corp. or done on an approved platform of Ameritas Investment Corp. For purposes of this Exclusion, "junk bonds" or "high yield bonds" shall mean bonds which, at the time of purchase or sale were unrated or rated as below investment grade by any rating agency (including but not limited to Moody's rated bonds of Ba or lower or S&P rated bonds of BB or lower).

V. LIMIT OF LIABILITY, SUPPLEMENTARY PAYMENTS, RELATED CLAIMS AND DEDUCTIBLE AMOUNT

    A. Limit of Liability

        1. Limit of Liability Each **Claim**: The Limit of Liability of the Insurer for all **Loss** for each **Claim** first made during the **Policy Period** and Extended Reporting Period,

if applicable, shall not exceed the amount stated in Item 4 of the Declarations for Each **Claim**.

    2.    Limit of Liability Each **Agent**: The Limit of Liability of the Insurer for all **Loss** for all **Claims** first made against each **Agent** during the **Policy Period** and Extended Reporting Period, if applicable, shall not exceed the amount stated in Item 4 of the Declarations as Aggregate Each **Agent**.

    3.    Limit of Liability **Sponsoring Company** and Other **Insureds**: No additional Limits of Liability are provided to the **Sponsoring Company** under Section I.C. or to **Insureds** as defined in Section III. I. 2 through 4. The Limit of Liability of the Insurer for **Loss** for all **Claims** first made against the **Sponsoring Company** and **Insureds** as defined in Section III. I. 2 through 4 during the **Policy Period** or Extended Reporting Period, if applicable, shall be that Limit of Liability applicable to the **Agent** whose **Wrongful Act** or **Wrongful Supervision or Termination Act** gave rise to the **Claim** or the **Agent** who is responsible for the **Wrongful Act** or **Wrongful Supervision or Termination Act** of such other **Insureds**.

    4.    Limit of Liability in the Aggregate for the **Policy Period**: The Limit of Liability of the Insurer for all **Loss** for all **Claims** first made against all **Insureds** and reported during the **Policy Period** and Extended Reporting Period, if applicable, shall not exceed the amount stated in Item 4 of the Declarations as Aggregate all **Loss** for the **Policy Period**.

B.    Supplementary Payments: The Insurer will pay, in addition to the applicable Limit of Liability, **Defense Costs** incurred by or at the direction of the Insurer in the defense of any **Claim** to which this insurance applies.

C.    Related Claims: All **Related Claims** shall be deemed a single **Claim**, subject to a single Each **Claim** Limit of Liability, if covered, and such **Claim** shall be considered first made on the date the earliest such **Related Claim** is first made against an **Insured**, regardless of whether such date is before or during the **Policy Period.**

D.    Deductible Amount: The Deductible Amount stated in Item 6 of the Declarations is applicable to each **Claim** and applies only to the payment of **Loss**. The Limits of Liability set forth in Item 4 of the Declarations are in addition to and in excess of the Deductible Amount.

VI.    EXTENDED REPORTING PERIODS

A.    Group Extended Reporting Periods

    1.    Automatic Extended Reporting Period: The **Insured** shall have a period of sixty (60) days after the expiration of the **Policy Period** to report in writing to the Insurer any **Claim** which is first made during said sixty (60) day period, and arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and prior to the end of the **Policy Period**.

This Automatic Extended Reporting Period shall not be available if the **Insured** has any other applicable insurance, including any policy issued subsequent to this Policy. This Automatic Extended Reporting Period shall be included within the Optional Extended Reporting Period described in paragraph A. 2. below, if such is purchased.

2. Optional Extended Reporting Period: In the event of cancellation or nonrenewal of this Policy by the Insurer, the **Sponsoring Company**, acting on behalf of all **Insureds** shall have the right to purchase an Optional Extended Reporting Period upon payment of an additional premium equal to 200% of the total annual premium which is the sum of the original annualized premium and the fully annualized amount of any additional premiums charged by the Insurer during the **Policy Period**. Pursuant to such Optional Extended Reporting Period, the **Insured** shall have a period of three years from the effective date of such cancellation or nonrenewal to give written notice to the Insurer of a **Claim** which is first made during such three year period and which arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and prior to the end of the **Policy Period**. The rights contained in this section shall terminate unless written notice of such election together with the additional premium due is received by the Insurer within thirty (30) days after the effective date of cancellation or nonrenewal.

3. If the Insurer cancels this Policy because the **Sponsoring Company** failed to pay a premium when due, the **Insureds** shall not have the right to the Automatic Extended Reporting Period or to purchase the Optional Extended Reporting Period as described in paragraphs A. 1. and 2. above.

4. The quotation of a different premium, deductible amount, limit of liability or policy terms or conditions for renewal shall not constitute a cancellation or nonrenewal for purposes of paragraph A.2 above.

B. Individual Agent Extended Reporting Periods

1. Automatic Extended Reporting Periods Due to Termination of **Agent Contract**: The insurance under this Policy shall cease as of the date of termination of the **Agent Contract**. In such event, the **Agent** shall be entitled to Extended Reporting Periods as follows:

   a. 90 Day Extended Reporting Period

      The **Insured** shall have a period of ninety (90) days after the date of termination of the **Agent Contract** or until the end of the **Policy Period**, whichever comes later, to give written notice to the Insurer of any **Claim**, and arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and before the date of termination of the **Agent Contact**.

   b. 1 Year Extended Reporting Period

      The **Insured** shall have a period of one (1) year after the date of termination of the **Agent Contract** to give written notice to the Insurer of any **Claim** which is first made during the one (1) year period, and arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and before the date of termination of the **Agent Contact**. Such reporting period, however, shall be limited to **Claims** solely involving products issued by the **Sponsoring Company** or sold through its **Broker/Dealer** subsidiary. The **Insured** shall not be entitled to this one (1) year Extended Reporting Period if the **Sponsoring Company** terminated the **Agent Contract** with the **Insured** for disciplinary reasons.

2.  Automatic Extended Reporting Period Due to Disablement, Retirement, or Death

If the **Agent** becomes disabled, retires from the business of providing **Professional Services** pursuant to and in accordance with formal retirement procedures of the **Sponsoring Company** or dies, the **Insured** or the legal representative of a deceased **Agent**, shall be entitled to a period of two (2) years after the date of termination of the **Agent Contract** by reason of disablement, retirement or death to give written notice to the Insurer of any **Claim** which is first made during said two (2) year period and arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and before the date of termination of the **Agent Contract** due to disablement, retirement or death.

The **Insured** shall not be entitled to any of the Automatic Extended Reporting Periods described in paragraphs A. 1 and B. 1 and 2 if the **Insured** has any valid and collectible insurance which applies to any **Loss** or **Defense Costs**.

3.  Optional Extended Reporting Periods

a.  An **Agent** who becomes disabled or retires from the business of providing **Professional Services** pursuant to and in accordance with formal retirement procedures of the **Sponsoring Company** or the legal representative of a deceased **Agent** may elect to purchase an Extended Reporting Period for **Claims** which are first made against an **Insured** and reported in writing to the Insurer within:

(i)  three (3) years of the date of termination of the **Agent Contract**, if the **Agent** or the legal representative of the deceased **Agent** pays an additional premium equal to 200% of the **Agent's** last annual premium within sixty (60) days of the date of termination of the **Agent Contract**; or

(ii)  five (5) years of the date of termination of the **Agent Contract**, if the **Agent** or the legal representative of the deceased **Agent** pays an additional premium equal to 300% of the **Agent's** last annual premium within sixty (60) days of the date of termination of the **Agent Contract**; or

(iii)  an unlimited amount of time after the date of termination of the **Agent Contact**, if the **Agent** or the legal representative of the deceased **Agent** pays an additional premium equal to 400% of the **Agent's** last annual premium within sixty (60) days of the date of termination of the **Agent Contract**.

b.  These Optional Extended Reporting Periods shall be in addition to any Automatic Extended Reporting Periods described in VI. A. and B above.

C. The Extended Reporting Periods do not reinstate or increase the Limit of Liability beyond the limits shown on the Declarations, nor extend the **Policy Period**.

D. **Claims** which are properly reported during an Extended Reporting Period will be deemed to have been made on the last day of the **Policy Period**.

VII. CONDITIONS

A. Notice and Cooperation

1. The **Insured** shall, as a condition precedent to the availability of rights provided under this Policy, give written notice to the Insurer as soon as practicable during the **Policy Period** but in no event more than sixty (60) days after the end of the **Policy Period**, of any **Claim** made against the **Insured** during the **Policy Period**, unless an Extended Reporting Period is applicable in which case its terms shall be controlling.

   Notwithstanding the requirements of the preceding paragraph, if continuous coverage is in effect pursuant to consecutive policies issued by the Insurer, a **Claim** may be reported to the Insurer in writing, as soon as practicable, during the policy period consecutive to and immediately following this **Policy Period** without constituting a violation of this provision. In such condition, the **Claim** will be deemed reported on the last day of the **Policy Period**.

2. The **Insured** shall not agree to arbitration or mediation, admit liability, make any payment, consent to any judgment, settle any **Claim** or incur any **Defense Costs** without the written consent of the Insurer.

3. The **Insured** shall furnish the Insurer with copies of demands, reports, investigations, pleadings and related papers, and provide other such information, assistance and cooperation as the Insurer may reasonably request in the investigation, settlement and defense of a **Claim**.

4. The **Insured** shall further cooperate with the Insurer and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment that the **Insured** may have.

5. All written notices provided for in this Policy shall be in writing and addressed to the Insurer at:

   Arch Insurance Group
   One Liberty Plaza
   53rd Floor
   New York, NY 10006

   For Claims and potential Claims:  Attn:  Professional Liability Claims

   All Other Notices:  Attn:  Vice President – Life Insurance Agents

B. Notice of Circumstances Giving Rise to a **Claim**

   If during the **Policy Period**, an **Insured** becomes aware of a **Wrongful Act** or **Wrongful Supervision or Termination Act** that could give rise to a **Claim** against an **Insured** and gives written notice to the Insurer prior to the end of the **Policy Period** of the following:

1.  the names of all potential claimants;

2.  the names of each **Insured** that committed the **Wrongful Act** or **Wrongful Supervision or Termination Act**;

3.  a detailed description of the **Wrongful Act** or **Wrongful Supervision or Termination Act**;

4.  the damage which has or may result from the **Wrongful Act** or **Wrongful Supervision or Termination Act;** and

5.  the circumstances by which the **Insured** first became aware of such **Wrongful Act** or **Wrongful Supervision or Termination Act**;

then any **Claim** which subsequently arises out of such **Wrongful Act** or **Wrongful Supervision or Termination Act** shall be treated as a **Claim** first made during the **Policy Period**.

C.  Territory

This Policy applies to **Wrongful Acts** or **Wrongful Supervision or Termination Acts** committed anywhere in the world provided that the **Claim** is made against the **Insured** in the United States of America, its territories or possessions.

D.  Other Insurance

If the **Insured** has other insurance which applies to any **Loss** or **Defense Costs** insured under this Policy, this Policy shall be excess over any other valid and collectible insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written as specific excess insurance over this Policy.

This provision will not apply if the **Insured** has other insurance with the Insurer, or an Affiliate of the Insurer. In such event, the **Insured** must elect the Policy under which the **Claim** will be made. If an **Insured,** other than the **Agent,** is entitled to coverage for the **Claim,** the **Agent** whose **Wrongful Act** or **Wrongful Supervision or Termination Act** is the basis of the **Claim** or who is legally responsible for such **Wrongful Act** or **Wrongful Supervision or Termination Act** shall be entitled to make the election and such election shall be binding on all other **Insureds**.

E.  Subrogation

In the event of any payment under this Policy, the Insurer shall be subrogated to all the **Insured's** rights of recovery thereof and the **Insured** shall execute and deliver all instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall do nothing after loss to waive or prejudice such rights. Any amounts recovered in excess of the Insurer's total payment shall be paid to the **Insureds**, less the cost to the Insurer of recovery. The Insurer agrees to waive any such rights of recovery against the **Sponsoring Company**.

F.  Changes

Notices to any agent or knowledge possessed by any agent shall not effect a waiver or a change in any part of this Policy or prevent the Insurer from asserting any rights under

the terms of this Policy, nor shall the terms of this Policy be waived or changed, unless endorsed hereon.

G.    Action Against the Insurer

No action shall be taken against the Insurer unless, as a condition precedent thereto, the **Insured** shall have fully complied with all the terms of this Policy, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the Insurer. Any person or organization or the legal representative thereof who has secured a judgment or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy. No person or organization shall have any right under this Policy to join the Insurer in any action against the **Insured** to determine the **Insured's** liability, nor shall the Insurer be impleaded by the **Insured** or their legal representative.

H.    Assignment of Interest

No assignment of interest under this Policy shall be binding on the Insurer unless its consent is endorsed hereon.

I.    Cancellation and Termination

1.    Termination: This Policy shall terminate at the earliest of the following times:

a.    upon expiration of the **Policy Period** as set forth in Item 3 of the Declarations, or the effective date of cancellation, if earlier;

b.    ten (10) days after receipt by the **First Named Insured** of a written notice of termination from the Insurer for failure to pay a premium when due; or

c.    as to the **Agent**, upon termination of the **Agent Contract.**

2.    Cancellation:

a.    This Policy may be cancelled by the **First Named Insured** by surrender thereof to the Insurer or by providing written notice to the Insurer stating when thereafter cancellation shall be effective. If this Policy is cancelled by the **First Named Insured**, the Insurer shall retain the customary short rate proportion of the premium.

b.    This Policy may be cancelled by the Insurer by providing written notice of cancellation to the **First Named Insured** at the address shown in Item 1 of the Declarations, with the effective date of the cancellation not less than sixty (60) days thereafter. Proof of mailing the notice of cancellation shall be sufficient proof of notice and this Policy shall terminate on the date and time specified in such notice. If the Insurer cancels this Policy, the earned premium shall be computed prorata. Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation.

J.    Transactions Changing Coverage

    1.    Change of Control of **Sponsoring Company**

If during the **Policy Period**, the **Sponsoring Company** consolidates with or merges into, or sells all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or any person or entity or group of persons or entities acting in concert shall acquire an amount of the outstanding securities representing more than fifty percent (50%) of the voting power for election of directors of the **Sponsoring Company,** or acquires the voting rights of such an amount of securities, then this Policy shall continue in full force and effect as to **Wrongful Acts** or **Wrongful Supervision or Termination Acts** committed prior to the effective date of such event.

The **Sponsoring Company** shall give the Insurer written notice of any such event as soon as practicable but not later than thirty (30) days after the date of such event.

    2.    Cessation of **Subsidiaries**

If an organization ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** shall continue until termination of this Policy.   Such coverage continuation shall apply only with respect to **Claims** for covered **Wrongful Acts** or **Wrongful Supervision or Termination Act** committed prior to the date such organization ceased to be a **Subsidiary**.

K.    Authorization Clause

By acceptance of this Policy, the **First Named Insured** shall act of behalf of the **Insureds** for all purposes, including but not limited to the payment or return of premium, receipt and acceptance of any endorsement issued to form a part of this Policy, giving and receiving notice of cancellation, termination or nonrenewal, or reimbursement to the Insurer of any Deductible Amount advanced.



# Arch
## Insurance Group®

Signature Page

IN WITNESS WHEREOF, Arch Insurance Company has caused this policy to be executed and attested.

Michael R. Murphy
President

Patrick K. Nails
Secretary

## Claims Handling Procedures

An important value of your insurance coverage is the ability of the insurance company to respond when you have a claim. Arch Specialty Insurance Company is committed to providing its insureds with effective claim services.

Notices of each incident, claim or suit must be sent immediately to:

Arch Specialty Insurance Company
ATTN: BROWN & BROWN PROGRAM SERVICES, INC., DBA LANCER CLAIMS SERVICES
P.O. BOX 7048
ORANGE, CA 92863-7048
Phone: 800-821-0540
Fax: 714-978-8023

You will be contacted by a representative of Lancer's Claim Department. This representative will confirm receipt of the loss notice directly to you, provide a company claim number for all future correspondence, refer to legal counsel if necessary, and discuss further handling of the claim.

06 ML0014 00 03 03

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http://www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

00 ML0065 00 06 07          Includes copyrighted material of Insurance Services          Page 1 of 1
Office, Inc. with its permission.
Case 5:18-cv-00104-MOC-DSC   Document 1-1   Filed 07/01/18   Page 39 of 87

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**SERVICE OF SUIT**

It is agreed that:

1.  In the event of the failure of the **Insurer** to pay any amount claimed to be due hereunder, the **Insurer**, at the request of the **Insured**, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction. All matters arising under this Policy shall be determined in accordance with the law and practice of such Court, provided that nothing shall prohibit the **Insurer** from removing any action, suit or proceeding to a United States District Court. The **Insurer** shall abide by the final decision of such court or any appellate court in the event of an appeal.

2.  Service of process in the above described action, suit or proceeding may be made upon: General Counsel, Arch Insurance Group Inc., One Liberty Plaza, 53rd floor, New York, NY 10006. Upon the request of the **Insured**, such General Counsel shall give a written undertaking to enter an appearance on behalf of the **Insurer** in the event that such an action, suit or proceeding shall be instituted.

3.  Pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the **Insurer** hereby designates the Superintendent, Commissioner, or Director of Insurance or other officer specified in such statute as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted against the **Insurer** upon this Policy. The Superintendent, Commissioner or Director of Insurance or other officer is hereby authorized and directed to accept service of process on behalf of the **Insurer** in any such action, suit or proceeding and to mail a copy of such process to the above mentioned General Counsel.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 1

Policy Number: CAP0050281 04

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2016

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**NEBRASKA STATE AMENDATORY ENDORSEMENT**

Endorsement forming part of and attaching to this Policy as stated above.

Paragraph 2., Cancellation of Subsection I., Cancellation and Termination is hereby deleted in its entirety and replaced with the following:

2.      Cancellation and Nonrenewal

**Cancellation by the Sponsoring Company**

This Policy may be cancelled by the **Sponsoring Company** shown in the Declarations by mailing or delivering to the Insurer or its authorized agent advance notice of cancellation.

**Cancellation by the Insurer**

a.   If this Policy has been in effect for 60 days or less, the Insurer may cancel this Policy for any reason.

b.   If this Policy has been in effect for more than 60 days or if this is a renewal of a policy the Insurer issued, the Insurer may cancel this Policy only for one or more of the following reasons:

(1)   Nonpayment of premium;

(2)   The Policy was obtained through material misrepresentation;

(3)   Any **Insured** has submitted a fraudulent claim;

(4)   Any **Insured** has violated the terms and conditions of this Policy;

(5)   The risk originally accepted has substantially increased;

(6)   Certification to the Director of Insurance of the Insurer's loss of reinsurance which provided coverage to the Insurer for all or a substantial part of the underlying risk insured; or

(7)   The determination by the Director of Insurance that the continuation of the Policy could place the Insurer in violation of the Nebraska Insurance Laws.

c.   If the Insurer cancels this Policy subject to **a.** or **b.** above, the Insurer will mail to the **Sponsoring Company** a written notice of cancellation, stating the reasons for cancellation, at least:

(1)   10 days before the effective date of cancellation if the Insurer cancels for nonpayment of premium; or

(2)   60 days before the effective date of cancellation if the Insurer cancels for any other reason.

(3)   The Insurer will mail its notice by first class mail to the **Sponsoring Company's** last mailing address known to the Insurer. A United States Postal Service Certificate of Mailing shall be sufficient proof of receipt of notice on the third calendar day after the date of the certificate of mailing.

**Nonrenewal**

If the Insurer decides not to renew this Policy, the Insurer will mail written notice of non renewal, stating the reasons for nonrenewal, to the **Sponsoring Company**, at least 60 days prior to the expiration date of this Policy.

Any notice of nonrenewal will be mailed by first class mail to the **Sponsoring Company's** last mailing address known to the Insurer. A United States Postal Service Certificate of Mailing shall be sufficient proof of receipt of notice on the third calendar day after the date of the certificate of mailing.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 2

Policy Number: CAP0050281 04

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2016

00 CAP0004 28 06 04

# Broker/Dealer Entity Endorsement

In consideration of the premium charged, it is agreed as follows:

I.   Policy Section I. INSURING AGREEMENTS is amended by adding:

    **E.   Broker/Dealer Liability**

        The Insurer shall pay on behalf of the **Broker/Dealer Insured** all **Loss** which the **Broker/Dealer Insured** shall become legally obligated to pay because of a **Claim** first made against the **Broker/Dealer Insured** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** or **Wrongful Supervision Act** committed on or after the **Retroactive Date** by an **Insured** solely in the rendering or failing to render **Professional Services**.

II.  Policy Section III. DEFINITIONS is amended to add:

    **Broker/Dealer Insured** shall mean Ameritas Investment Corp.

III. For purposes of the coverage provided by I. INSURING AGREEMENTS, E: Policy Section III. DEFINITIONS, N. **Professional Services**, 1 is amended to add:

    d.   **Securities** (other than variable annuities, variable life insurance and mutual funds) that were authorized or approved by the **Broker/Dealer Insured** or that were processed through the **Broker/Dealer Insured**.

IV.  For purposes of the coverage provided by I. INSURING AGREEMENTS, E, this Policy does not apply to any **Claim** based upon, arising out of or in any way involving any **Wrongful Act** that any **Insured** had knowledge of before 7/1/2013 or any **Claim** based upon, arising out of or in any way involving any demand suit or proceeding pending, or order, decree or judgment made or initiated against an **Insured** before 7/1/2013.

V.   For purposes of the coverage provided by I. INSURING AGREEMENTS, E, Policy Section IV. EXCLUSIONS, W. is deleted in its entirety and replaced with:

    W.  based upon, arising out of or in any way involving any **Securities** (other than variable annuities, variable life insurance and mutual funds) that were not authorized or approved by the **Broker/Dealer Insured** or **Securities** that were not processed through the **Broker/Dealer Insured**;

VI.  For purposes of the coverage provided by I. INSURING AGREEMENTS, E, this Policy does not apply to any **Claim** based upon, arising out of or in any way involving any underwriting, syndicating, investment banking services or associated counseling by an **Insured**.

VII. For purposes of this Endorsement, Policy Section V. RETENTION D. is amended to add:

    The Retention applicable to INSURING AGREEMENT E. shall be $5,000 for the **Broker/Dealer Insured** and applies to the payment of **Loss** and **Defense Costs**.

00 ML0207 00 11 03

Case 5:18-cv-00104-MOC-DSC   Document 1-1   Filed 07/01/18   Page 43 of 87

VIII.     For purposes of this Endorsement, Policy Section V., A. Limit of Liability is amended to add:

Coverage under this Endorsement shall be subject to Limits of Liability in the amount of $1,000,000 each **Claim** and $5,000,000 in the aggregate hereunder for the Policy Period.

Such limit shall be part of and not in addition to the Limit of Liability stated in Item 4. of the Declarations.


All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 3

Policy Number:  CAP0050281 04

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2016

00 ML0207 00 11 03

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**SUPPLEMENTARY PAYMENTS AMENDATORY ENDORSEMENT**

It is understood and agreed that Section V.B. SUPPLEMENTARY PAYMENTS is deleted and replaced by with the following:

B.     Supplementary Payments: The Insurer will pay, in addition to the applicable Limits of Liability, **Defense Costs** incurred by or at the direction of the Insurer in the defense of any **Claim** to which this insurance applies. However, the payment of **Defense Costs** shall be subject to a maximum limit of liability of $1,000,000 each **Claim** and in the aggregate each **Insured Agent** or Union Central Life Insurance Company, Ameritas Investment Corp. and/or Carillon Investments.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 4

Policy Number: CAP0050281 04

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2016

00 ML0207 00 11 03

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

In consideration of the premium charged, it is agreed that Section IV. EXCLUSIONS, is amended to add the following:

BB.    based upon, arising out of or any way involving the **Insured** exercising discretionary authority with regard to the management, acquisition or disposition of assets or liabilities for a client's account; however, this Exclusion shall not apply to Representatives or Advisors who are approved by Ameritas Investment Corporation and then only to the extent such discretionary authority is within the policies, procedures and guidelines of Ameritas Investment Corporation;

All other terms and conditions of this Policy remain unchanged.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 5

Policy Number: CAP0050281 04

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2016

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**INDEPENDENT REGISTERED INVESTMENT ADVISER COVERAGE**

**ENDORSEMENT**

In consideration of the premium charged, it is agreed as follows:

1.   Coverage is provided under this Endorsement for the **Registered Investment Advisers** whose names are on file with the Insurer.

For purposes of this Endorsement, Section III. DEFINITIONS is amended by adding the following:

V. **Investment Advisory Services** means advisory services rendered for a client by a **Registered Investment Adviser** pursuant to the Investment Advisers Act of 1940, and any amendments thereto, provided that prior to providing any such services, the **Registered Investment Adviser** received written approval from Ameritas Investment Corporation to conduct such services;

W. **Registered Investment Adviser** means an **Agent** who is registered as a registered representative with the National Association of Securities Dealers and is also registered as an "Investment Adviser" as that term is defined in the Investment Advisers Act of 1940, and any amendments thereto, with the Securities and Exchange Commission and/or registered or licensed with any other appropriate authorities, including any state securities commission;

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 6

Policy Number:  CAP0050281 04

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2016

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMEND LIFE SETTLEMENTS AND OPTIONS EXCLUSION – SUBLIMIT**

**AMENDATORY ENDORSEMENT**

It is agreed as follows:

1.      Section IV. EXCLUSIONS, Z is deleted and replaced bywith the following:

      Z.    based upon, arising out of or in any way involving the purchase, sale or the giving of advice regarding promissory notes, viatical or life settlements of any **Security** backed by viatical settlements, commodities, commodity future contracts, or option contracts other than option contracts approved by Ameritas Investment Corporation; however, this Exclusion shall not apply to the purchase or sale of or the giving of advice regarding life settlements arranged through a provider or broker approved by Union Central Life Insurance Company, Ameritas Investment Corp. and/or Carillon Investments, Inc.;

2.      For the purposes of this Endorsement, it is agreed that the coverage for life settlements is subject to a Sub-Limit of Liability in the amount of $500,000 each **Claim** and in the aggregate for each **Agent** enrolled hereunder for the Policy Period. Such Sub-Limit of Liability are included in, and are not in addition to, the Limits of Liability otherwise provided to each such **Agent** under the Policy. Such Limits of Liability are subject to a per **Claim** deductible of $2,500, which is applicable to both **Loss** and **Defense Costs**.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 7

Policy Number: CAP0050281 04

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2016

Case 5:18-cv-00104-MOC-DSC   Document 1-1   Filed 07/01/18   Page 48 of 87

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMENDMENT TO RETROACTIVE DATE ENDORSEMENT**

In consideration of the premium charged, it is hereby understood and agreed that Section III. DEFINITIONS, P. is deleted in its entirety and replaced with the following:

P. **Retroactive Date** means:

    a.   for **Professional Services** as defined in Section III. N.1. a., b. and c. and N.2., N.3., and N.4., the earlier of: (1) the **Agent's** date of contract with the **Sponsoring Company**; or (2) the inception date of the **Agent's** first claims-made life insurance agents or registered representative professional liability policy from which date coverage has been maintained in force without interruption;

    b.   for all other covered **Professional Services**, the **Agent's** date of contract with Carillon Investments, Ameritas Investment Corp., The Advisors Group and/or the **Sponsoring Company**.

The **Retroactive Date** for the **Sponsoring Company** and **Insureds** defined in Section III. I. 2 through 4 shall be the same as applicable to the **Agent** whose **Wrongful Act** or **Wrongful Supervision** or **Termination Act** gave rise to the **Claim** or the **Agent** who is responsible for the **Wrongful Act** or **Wrongful Supervision** or **Termination Act** of such other **Insureds**.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 8

Policy Number: CAP0050281 04

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2016

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMENDMENT OF PROFESSIONAL SERVICES (DELETION OF SECURITIES**

**COVERAGE) ENDORSEMENT – OPTION 1 & 2**

In consideration of the premium charged, it is agreed as follows:

I.      Section III. DEFINITIONS, N. Professional Services, paragraph 1.d. is deleted.

II.     Section IV. EXCLUSIONS, W is deleted i and replaced by the following:

W.  based upon, arising out of or in any way involving any **Securities** (other than variable annuities, variable life insurance and mutual funds);

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 9

Policy Number: CAP0050281 04

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2016

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**SECURITIES PRODUCTS ENDORSEMENT – OPTION 3**


It is agreed as follows:

I.      For purposes of this Endorsement, **Insured** means any **Agent**: (A) who has paid a premium; and (B) whose name is on file with the Insurer.

II.     For those **Insureds** as defined in paragraph I above, Policy Section III. DEFINITIONS, N. **Professional Services**, paragraph 1.d is deleted and replaced by the following:

        d.   **Securities** (other than variable annuities, variable life insurance and mutual funds) that were authorized or approved by the **Broker/Dealer** subsidiary of the **Sponsoring Company** and/or Carillon Investments or that were processed through the **Broker/Dealer** subsidiary of the **Sponsoring Company** and/or Carillon Investments;

III.    For purposes of coverage provided by this Endorsement, Policy Section IV. EXCLUSIONS, W is deleted and replaced by the following:

        W.  based upon, arising out of or in any way involving any **Securities** (other than variable annuities, variable life insurance and mutual funds) that were not authorized or approved by the **Broker/Dealer** subsidiary of the **Sponsoring Company** and/or Carillon Investments or **Securities** that were not processed through the **Broker/Dealer** subsidiary of the **Sponsoring Company** and/or Carillon Investments.


All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 10

Policy Number: CAP0050281 04

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries


Endorsement Effective Date: 07/01/2016

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**SPECIFIC PRODUCT EXCLUSION ENDORSEMENT**

It is agreed that Section IV. EXCLUSIONS is amended to add the following:

Based upon, arising out of or in any way involving the purchase, sale or giving of advice regarding:

1. callable certificates of deposit; however this exclusion shall not apply to Callable CDs approved by Carillon Investments, Inc. and/or Ameritas Investment Corp.;

2. any investment involving ATM machines, payphones or ETS payphones;

3. Debentures; however this exclusion shall not apply to Debentures approved by Carillon Investments, Inc. and/or Ameritas Investment Corp.;

4. DBSI Management Products;

5. Provident Royalties;

6. Medical Capital Nate Program;

7. Black Diamond Program;

8. Desert Capital REIT;

9. IMH Secured Loan Fund, LLC; or

10. Geneva Exchange LLC/The Geneva Organization;

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 11

Policy Number: CAP0050281 04

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2016

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**TERMINATED AGENTS ENDORSEMENT**

In consideration of the premium charged, it is agreed that III. DEFINITIONS, I. Insured, is amended to include the following:

7. Brokers who, prior to the effective date of their broker's contract with the **Sponsoring Company**, were party to an **Agent's Contract** with that insurance company and were an **Insured** under this policy; provided that they are licensed by the appropriate authority to solicit and sell the products and/or services made available by the **Sponsoring Company**. Such individuals shall be specifically designated by name, and their names shall be on file with the Company.

For the purposes of this Endorsement, it is further agreed and understood that Section B. of INSURING AGREEMENTS, VI. EXTENDED REPORTING PERIODS shall be deleted in its entirety and replaced by the following:

B.   Individual Agent Extended Reporting Periods

    1.   Automatic Extended Reporting Periods Due to Termination of broker contract: The insurance under this Policy shall cease as of the date of termination of the broker contract. In such event, the broker shall be entitled to Extended Reporting Periods as follows:

        a.   90 Day Extended Reporting Period

        The **Insured** shall have a period of ninety (90) days after the date of termination of the broker contract to give written notice to the Insurer of any **Claim** which is first made during said ninety (90) day period, and arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and before the date of termination of the broker contact.

        b.   1 Year Extended Reporting Period

        The **Insured** shall have a period of one (1) year after the date of termination of the broker contract to give written notice to the Insurer of any **Claim** which is first made during the one (1) year period, and arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and before the date of termination of the broker contact. Such reporting period, however, shall be limited to **Claims** solely involving products issued by the **Sponsoring Company** or sold through its **Broker/Dealer** subsidiary. The **Insured** shall not be entitled to this one (1) year Extended Reporting Period if the **Sponsoring Company** terminated the broker contract with the **Insured** for disciplinary reasons.

    2.   Automatic Extended Reporting Period Due to Disablement, Retirement, or Death

        If the broker becomes disabled, retires from the business of providing **Professional Services** pursuant to and in accordance with formal retirement procedures of the **Sponsoring Company** or dies, the **Insured** or the legal representative of a deceased broker, shall be entitled to a period of two (2) years after the date of termination of the broker contract by reason of disablement,

retirement or death to give written notice to the Insurer of any **Claim** which is first made during said two (2) year period and arises out of a **Wrongful Act** or **Wrongful Supervision or Termination Act** committed on or after the **Retroactive Date** and before the date of termination of the broker contract due to disablement, retirement or death.

The **Insured** shall not be entitled to any of the Automatic Extended Reporting Periods described in paragraphs A. 1 and B. 1 and 2 if the **Insured** has any valid and collectible insurance which applies to any **Loss** or **Defense Costs**.

3.    Optional Extended Reporting Periods

    a.    A broker who becomes disabled or retires from the business of providing **Professional Services** pursuant to and in accordance with formal retirement procedures of the **Sponsoring Company** or the legal representative of a deceased broker may elect to purchase an Extended Reporting Period for **Claims** which are first made against an **Insured** and reported in writing to the Insurer within:

        (i)    three (3) years of the date of termination of the broker contract, if the broker or the legal representative of the deceased broker pays an additional premium equal to 200% of the broker's last annual premium within sixty (60) days of the date of termination of the broker contract; or

        (ii)    five (5) years of the date of termination of the broker contract, if the broker or the legal representative of the deceased broker pays an additional premium equal to 300% of the broker's last annual premium within sixty (60) days of the date of termination of the broker contract; or

        (iii)    an unlimited amount of time after the date of termination of the broker contact, if the broker or the legal representative of the deceased broker pays an additional premium equal to 400% of the broker's last annual premium within sixty (60) days of the date of termination of the broker contract.

    b.    These Optional Extended Reporting Periods shall be in addition to any Automatic Extended Reporting Periods described in VI. A. and B above.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number:12

Policy Number: CAP0050281 04

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 7/1/2016

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**TRADE ERRORS OR COST OF CORRECTIONS ENDORSEMENT**

In consideration of the premium charged, it is agreed as follows:

I.     INSURING AGREEMENT

For purposes of this Endorsement, Policy Section I. INSURING AGREEMENTS is amended by adding the following

     D.  Trading Error Reimbursement

     The Insurer shall reimburse the **Named Insured** all **Trading Loss** which the **Insured** first becomes aware of during the **Policy Period**, or an Extended Reporting Period, if applicable, for a **Trading Error** committed on or after the **Retroactive Date** by an **Insured** solely in the rendering or failing to render **Professional Services.**

II.    DEFINITIONS

For purposes of this Endorsement, Policy Section III. DEFINITIONS is amended as follows:

A.  Policy Section III. F is amended to add the following:

    With respect to the coverage provided under Section I. D, only, **Claim** shall include **Trading Error**.

B. The following definitions are added:

**Trading Error** means the **Insured's** negligent act, error or omission resulting in the failure to follow the directions of a client when purchasing or selling products defined in Section M. 1. b. and 3. and which if not corrected, will likely result in a **Claim** as defined in Section F. 1, 2 or 3.

**Trading Loss** means the actual cost of correcting the transaction so that it conforms with the instructions of the **Insured's** client. **Trading Loss** shall not include any *ex gracia* payments or amounts for which the **Insured** is not legally liable.

III. RETENTION

For purposes of this Endorsement, Policy Section V. D. is amended to add the following:

The Retention applicable to INSURING AGREEMENT D. shall be $50,000 for the **Broker/Dealer Insured** and $5,000 for the individual **Registered Representative**.

IV. LIMITS OF LIABILITY

Coverage under this Endorsement shall be subject to Limits of Liability in the amount of $1,000,000 each **Claim** and in the aggregate for each **Insured** enrolled hereunder for the Policy Period.  Such Limits of Liability are included in, and are not in addition to, the Limits of Liability otherwise provided to each such **Insured** under the Policy.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 13

Policy Number:  CAP0050281 04

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2016

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NETWORK SECURITY BREACH & PRIVACY COVERAGE

It is agreed that:

1. the Insuring Agreement is amended to include Insuring Agreement F Network Security Breach & Privacy Coverage.

   F Network Security Breach & Privacy Coverage:

   The Company will pay on behalf of the INSURED:

   1. all sums, which the INSURED will become legally obligated to pay as DAMAGES and DEFENSE COSTS made or occurring during the POLICY PERIOD and reported to the Insurer during the POLICY PERIOD or any Extended Reporting Period, if applicable because of actual monetary damages to the INSURED'S client arising out of a NETWORK SECURITY BREACH or PRIVACY VIOLATION;

   2. CRISIS MANAGEMENT EXPENSES that are a direct result of a NETWORK SECURITY BREACH or PRIVACY VIOLATION made or occurring during the POLICY PERIOD and reported to the Insurer during the POLICY PERIOD or any Extended Reporting Period, if applicable and;

   3. CREDIT MONITORING COSTS that are the direct result of a NETWORK SECURITY BREACH or PRIVACY VIOLATION that:

      a. directly results in theft or unauthorized copying of PERSONAL INFORMATION and may reasonably be expected to result in IDENTITY THEFT;

      b. first occurred during the POLICY PERIOD; and

      c. is reported in accordance with the applicable Notice Condition of this Policy;

   4. DATA RESTORATION COSTS that are the direct result of a NETWORK SECURITY BREACH or PRIVACY VIOLATION made or occurring during the POLICY PERIOD and reported to the Company during the POLICY PERIOD or any Extended Reporting Period, if applicable and that first occurred during the POLICY PERIOD and that directly results in:

      a. MALICIOUS ENCRYPTION of a DATA ASSET; or

      b. the CORRUPTION of a DATA ASSET;

      provided that such MALICIOUS ENCRYPTION or CORRUPTION first occurred during the POLICY PERIOD and is reported in accordance with the applicable Notice Condition of this Policy.

2. Solely with respect to the coverage provided by this Endorsement, the following sub limits of liability and deductibles will apply. Sub limits will be part of and not in addition to the Aggregate Limit of Liability listed on the Declarations Page:

   $100,000    Each Claim and in the Aggregate per INSURED for C.1.; a $5,000 Deductible will apply for DAMAGES and DEFENSE COSTS

$100,000 Each Claim and in the Aggregate per INSURED for C.2. CRISIS MANAGEMENT EXPENSES; a $5,000 Deductible will apply for DAMAGES and DEFENSE COSTS

$100,000 Each Claim and in the Aggregate per INSURED for C.3. CREDIT MONITORING COSTS; a $5,000 Deductible will apply for DAMAGES and DEFENSE COSTS

$100,000 Each Claim and in the Aggregate per Insured for C.4. DATA RESTORATION COSTS; a $5,000 Deductible will apply for DAMAGES and DEFENSE COSTS

The total Policy Aggregate for Network Security Breach and Privacy Coverage will be $1,000,000

3. Solely with respect to the coverage provided by this Endorsement, the Definitions Section in the Policy is amended by appending the following to the end thereof:

"BODILY INJURY" means injury to the body, sickness, or disease sustained by a person, including death resulting there from, and, if arising out of the foregoing, BODILY INJURY also means mental injury, mental anguish, mental tension, emotional distress, pain and suffering, or shock.

"CRISIS MANAGEMENT EXPENSES" are defined as necessary and reasonable expenses incurred by the INSURED with the Company's prior written consent, to hire an attorney (selected from the Company's panel counsel) to determine whether any breach notice law apply and the obligations of any such applicable laws including the drafting of letters to satisfy the applicable law, including the cost to notify those affected by the NETWORK SECURITY BREACH or PRIVACY VIOLATION and/or with the Company's consent, to provide CREDIT MONITORING SERVICES to the INSURED'S clients. CRISIS MANAGEMENT EXPENSES will also include approved expenses incurred by the INSURED to respond to a regulatory action commenced or pending solely against the INSURED and not involving the SPONSORING COMPANY, and/or the hiring of a public relations firm, with the Company's prior written consent, to communicate with the INSURED'S clients in order to mitigate the reputational damage of the INSURED directly resulting from a NETWORK SECURITY BREACH or PRIVACY VIOLATION.

"CREDIT MONITORING COSTS" will mean the costs for retaining a third party service provider approved by the Company and with the Company's prior written consent to provide CREDIT MONITORING SERVICES to those individuals who were victims of IDENTITY THEFT.

"CREDIT MONITORING SERVICES" will mean services that allow individuals to access and review their credit reports to determine if IDENTITY THEFT has occurred.

"IDENTITY THEFT" will mean the theft or unauthorized copying of PERSONAL INFORMATION of a client of the INSURED, and use of such PERSONAL INFORMATION to open new financial accounts for the purpose of fraudulently impersonating such individual, including without limitation, payment card accounts, bank accounts, loan accounts, health insurance accounts and insurance accounts.

"CORRUPTION" means alteration, corruption, destruction deletion or damage as the direct result of a NETWORK SECURITY BREACH.

"DATA ASSET" means any electronic data existing in the INSURED'S COMPUTER SYSTEM that is subject to regular back up procedures, including but not limited to any databases, software or trade secrets stored thereon.

"DATA LOSS" means:

1. with respect to the CORRUPTION of any DATA ASSET, RESTORATION COSTS; and

2. with respect to any DATA ASSET that is rendered inaccessible or unreadable as a result of MALICIOUS ENCRYPTION, the lesser of RESTORATION COSTS or the actual, necessary and reasonable costs and expense to regain access to such DATA ASSET or render it readable;

00 CAP0130 00 04 16                Page 2 of 6

Case 5:18-cv-00104-MOC-DSC  Document 1-1  Filed 07/01/18  Page 58 of 87

provided, however, that if such DATA ASSET cannot reasonably be accessed, restored, rendered readable, gathered, assembled or recollected, then DATA LOSS means the actual, reasonable and necessary costs and expenses incurred by the INSURED ORGANIZATION to reach this determination.

"DATA LOSS" will not mean, and there will be no coverage for:

1.  costs or expenses incurred by the INSURED ORGANIZATION to identify or remediate software program errors or vulnerabilities or update, replace, restore, gather, assemble, reproduce, recollect or enhance a DATA ASSET to a level beyond that which existed prior to its CORRUPTION or MALICIOUS ENCRYPTION.

2.  costs or expenses to research or develop any DATA ASSET, including but not limited to trade secrets or other proprietary information;

3.  the monetary value of, or profits, royalties, or lost market share related to, a DATA ASSET, including but not limited to trade secrets or other proprietary information or any other amount pertaining to the value of the DATA ASSET;

4.  DAMAGES arising out of any liability to third-parties for whatever reason;

5.  salaries of employees, directors or officers of the INSURED; or

6.  legal costs or legal expenses of any type.

"MALICIOUS ENCRYPTION" means the strong encryption of a DATA ASSET by a malicious person that renders such DATA ASSET inaccessible or unreadable to the INSURED ORGANIZATION.

"DATA RESTORATION COSTS" will mean the costs for retaining a third party service provider approved by the Insurer and with the Insurer's prior written consent to restore, recover or replicate electronic data in the care, custody or control of the INSURED that is damaged or destroyed as a direct result of a NETWORK SECURITY BREACH or PRIVACY VIOLATION.

"NETWORK SECURITY BREACH" is defined as:

1.  the actual failure and inability of security to prevent:

    a.  unauthorized access to or unauthorized use of PERSONAL INFORMATION stored in the INSURED'S COMPUTER SYSTEM;

    b.  the theft or unauthorized copying of PERSONAL INFORMATION on the INSURED'S COMPUTER SYSTEM;

2.  the actual failure and inability of physical security to prevent the theft of PERSONAL INFORMATION as a result of the physical theft by a person other than an INSURED of the INSURED'S computer hardware or storage media from a premise occupied and controlled by the INSURED.

"INSURED'S COMPUTER SYSTEM" means any computer hardware, software or firmware, and components thereof including data stored thereon, that is owned or leased by the INSURED and is under the direct operational control of the INSURED.

"PRIVACY VIOLATION" is defined as any:

1.  theft of PERSONAL INFORMATION; while in the care, custody or control of an INSURED;

2.    violation of a PRIVACY REGULATION as defined below.

"PERSONAL INFORMATION" means any:

1.    INSURED'S client's name in combination with any one or more of the following:

    a.    social security number;

    b.    drivers license number or any other state identification number;

    c.    medical or healthcare data including protected health information; or

    d.    any account number, credit or debit card number in combination with any required password, access code or other security code that would permit access to the financial account; or

2.    non-public personal information as defined in any PRIVACY REGULATION.

"PRIVACY REGULATION" means those parts of the following statutes or regulations which regulate the use and protection of non-public personal information (as defined in such statutes or regulations):

**1.**    Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the rules and regulations promulgated thereunder as amended;

**2.**    Gramm-Leach Bliley Act of 1999 (GLBA) and the rules and regulations promulgated thereunder, as amended;

**3.**    Consumer protection and unfair and deceptive trade practice laws enforced by state Attorneys General or the Federal Trade Commission, including but not limited to Section 5(a) of the FTC Act 15;

**4.**    Security Breach Notification laws that require notice to individuals of the actual or potential theft of their non-public personal information, including but not limited to the California Security Breach Notification Act of 2003 (CA SB 1386); or

**5.**    Other state, federal or foreign privacy laws requiring reasonable security for non-public personal information, or a privacy policy limiting the sale, disclosure or sharing of non-public personal information or providing individuals with the right to access or correct non-public personal information.

"PROPERTY DAMAGE" means:

1.    physical injury to, loss or destruction of tangible property, including loss of use thereof; or

2.    loss of use of tangible property which has not been physically injured or destroyed.

**5.**    This Endorsement does not apply to any Claim alleging, based upon, arising out of, or resulting from, directly or indirectly:

    a.    any costs or expenses for the reprinting, reposting, recall, removal or disposal of any online content or any other information, content or media, including any media or products containing such online content, information, content or media;

b.   any wear and tear or gradual deterioration of any data saved or of an INSURED'S COMPUTER SYSTEM;

or attributable to any costs or expenses incurred by any INSURED or others:

   1.   to recall, repair, withdraw, replace, upgrade, supplement or remove the INSURED'S online content, products or services from the marketplace, including but not limited to products or services which incorporate the INSURED'S online content, products or services;

   2.   for any loss of use by any INSURED or others that arises out of such recall, repair, withdrawal, replacement, upgrade, supplementation or removal.

c.   any failure to use best efforts to install commercially available software product updates and releases, or to apply security related software patches, to computers and other components of the INSURED'S COMPUTER SYSTEM;

d.   BODILY INJURY or PROPERTY DAMAGE;

e.   any seizure, confiscation, destruction or nationalization of INSURED'S COMPUTER SYSTEM; or any data asset by or on behalf of any governmental or public authority;

f.   any interruption, suspension, failure or outage of any component of the Internet, including without limitation any hardware or software infrastructure supporting the Internet;

g.   any fine or penalty arising out of any agreement by any INSURED to comply with or follow the PCI Standard or any Payment Card Company rules, or implement, maintain or comply with any security measure(s) or standard(s) related to any payment card data; or

h.   alleging, based upon, arising out of, or resulting from, directly or indirectly, any unsolicited electronic faxes, emails, telephone calls or unsolicited communications, including but not limited to Claims arising out of unsolicited electronic messages, chat room postings, bulletin board postings, newsgroup postings, "pop-up" or "pop-under" Internet advertising or fax-blasting, direct mailing or telemarketing, or Claims alleging violations of the Telephone Consumer Protection Act, of 1991, as amended, the CAN-SPAM Act of 2003, as amended, and any other federal, foreign or state anti-spam statutes, or federal, foreign or state statue, law or regulation relating to a person's right to seclusion;

i.   alleging, based upon, arising out of, or resulting from, directly or indirectly, any unauthorized or illegal collection of PERSONAL INFORMATION by any INSURED or by the SPONSORING COMPANY, including but not limited to the collection of PERSONAL INFORMATION using cookies, spyware, or other malicious code, or the failure to provide adequate notice that PERSONAL INFORMATION is being collected;

j.   alleging, based upon, arising out of, or resulting from, directly or indirectly, to section 605 (requirements relating to information contained in consumer reports) or 616 (civil liability for willful noncompliance) of the Fair Credit Reporting Act, or any other similar federal, state or local laws or regulations, including but not limited to any laws or regulations requiring truncation of payment card numbers on, or the removal of the expiration date from, payment card receipts; or

k.   any Claim involving in any way any liability of the SPONSORING COMPANY;

l.   any Claim involving data in the control of the SPONSORING COMPANY; or

m.   any Claim covered in whole or in part under any other insurance.

**6.**   The following paragraph is added to Section I. INSURED'S DUTIES IN THE EVENT OF A CLAIM:

With respect to Network Security Breach and Privacy Coverage, as a condition precedent to coverage, the INSURED will provide written notice to the Company of the NETWORK SECURITY BREACH or PRIVACY VIOLATION for which it seeks coverage as soon as practicable and in all events within 30 days after the expiration of the POLICY PERIOD.

All other terms and conditions of this Policy remain unchanged.

All other terms and conditions of this Policy remain unchanged.

Issued By: ARCH INSURANCE COMPANY

Endorsement Number: 14

Policy Number:  CAP0050281 04

Named Insured: Ameritas Life Insurance Corp. & Subsidiaries

Endorsement Effective Date: 07/01/2016

FILED

2016 MAY 30 | P 2: 52

CATAWBA CO. C.S.C.

## TOLLING AGREEMENT

This TOLLING AGREEMENT (the "**Agreement**") is made and entered into this the 19th day of October, 2016, by and between Hickory Springs Manufacturing Company ("**HSM**") and Robert V. Donovan, Compensation Consultants, LLC, and Capital Concepts, LLC (collectively, "**Donovan Parties**", with HSM, the "**Parties**").

WHEREAS, HSM purchased Supplemental Executive Retirement Plans from Penn Mutual Insurance and Annuity Company in or about 2012, and believes that it may have claims relating to these transactions, which the Donovan Parties deny (the "**Claims**");

WHEREAS, HSM desires to retain the right, to settle or otherwise address the Claims and wish to fully preserve the Claims, to the extent such claims were timely filed on or before October 3, 2016, notwithstanding the pendency and passage of time;

WHEREAS, the Parties have agreed it is in their best interests to toll the Claims from the effective date of this Agreement to permit the Parties to negotiate and investigate the Claims.

Now, therefore, in consideration of the foregoing and in further consideration of the covenants, representations and warranties contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties have agreed to enter into this Agreement as set forth below:

1.      By this Agreement, the Donovan Parties and HSM agree to preserve the status quo between them as of October 3, 2016.  In order to preserve the status quo and the intent of their Agreement, the Donovan Parties and HSM agree that any and all statutes of limitations and other time-related defenses with respect to the Claims, whether at law or in equity, including, but not limited to, laches (collectively, "**Time-Related Defenses**"), are tolled until the earlier of: (x) six months from the date of this Agreement; or (y) the date that is sixty (60) days after either

{00277513 v 1 } 1

EXHIBIT

C

Party terminates this Agreement in accordance with paragraph 2 below (hereinafter, the "**Extended Tolling Period**"). The Parties agree that the Time-Related Defenses will not be asserted or used as a defense to any action with respect to any Claim that is brought by or on behalf of HSM against the Donovan Parties on or before the last day of the Extended Tolling Period; provided, however, that the Parties further agree and acknowledge that this Agreement is not intended to waive, alter or diminish the right of any Party hereto to assert any Time-Related Defense to the extent that the same could have been asserted as of October 3, 2016. For the avoidance of doubt, nothing in this Agreement shall prevent the Donovan Parties from asserting that any Claim became subject to or barred by any Time-Related Defenses on or before October 3, 2016, and nothing in this Agreement shall prevent HSM from contesting such assertion.

2.    This Agreement may be terminated by either Party by providing written notice of termination by the terminating Party to each of the other Parties in accordance with paragraph 7 below. This Agreement shall remain in effect for sixty (60) calendar days after the receipt of a notice of termination sent pursuant to this paragraph, at which time this Agreement shall be terminated as to each of the Parties.

3.    The Donovan Parties and HSM agree and acknowledge that the tolling of the Time-Related Defenses with respect to the Claims applies, without limitation, to any and all statutes, regulations, or other rules of law, which limit the period in which any action may be commenced, without regard to the basis for such Claims.

4.    Nothing in this Agreement shall be construed as an admission of any liability by the Donovan Parties to any person or party. Nothing in this Agreement shall be construed as an admission of any fact by any Party in any proceeding, at law or in equity, and none of the Parties shall contend in any proceeding at law or in equity that this Agreement is admissible or relevant

as evidence for any purpose, except to the extent necessary in an action to enforce the express terms of this Agreement itself. Except for matters specifically addressed by this Agreement, the Parties expressly reserve all claims, rights and defenses against and with respect to each other.

5.     This Agreement shall not revive any Claims, which, on or before October 3, 2016, may have been barred by any Time-Related Defense.

6.     The Parties agree that, except as expressly permitted herein, no party to this Agreement or any person acting for or on their behalf, including their respective attorneys, if any, shall directly or indirectly reveal to any person any of the terms or conditions of this Agreement, or release any publicity or make any public statement with respect thereto, (other than, as context permits, attorneys, accountants, and other professional representatives of the Parties, and any other persons or entities as required by statute) except as may be required by a court of competent jurisdiction. The Parties agree that any breach of this confidentiality provision will necessarily cause irreparable damage to the non-breaching party and that the non-breaching party shall be entitled to injunctive relief.

7.     All notices required or permitted hereunder shall be sent certified mail, return receipt requested and by electronic mail to the Parties at the addresses listed below:

> To Hickory Springs Manufacturing Company:
> Ross R. Fulton
> Rayburn Cooper & Durham, P.A.
> 227 W. Trade Street, Suite 1200
> Charlotte, NC 28202
> rfulton@rcdlaw.net
>
> To the Donovan Parties:
> Jacob Wellman
> Teague Campbell Dennis & Gorham, LLP
> P.O. Box 19207
> Raleigh, NC 27619-9207
> jwellman@teaguecampbell.com

{00277513 v 1 }3

8.     This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and their respective successors and assigns.

9.     The undersigned represent that they are authorized to sign this Agreement on behalf of the respective Parties.

10.     This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of North Carolina, without reference to the conflicts or choice of law principles thereof.

This the 19th day of October, 2016.

HICKORY SPRINGS MANUFACTURING COMPANY

By: _____
Ross R. Fulton, its Attorney


COMPENSATION CONSULTANTS, LLC

By: _____
Jacob Wellman, its Attorney


CAPITAL CONCEPTS, LLC

By: _____
Jacob Wellman, its Attorney


ROBERT V. DONOVAN, individually

By: _____
Jacob Wellman, its Attorney

{00277513 v 1 }4

## AMENDMENT TO TOLLING AGREEMENT

This Amendment (the "**Amendment**") is made and entered into this the 10th day of October, 2017, by and between Hickory Springs Manufacturing Company ("HSM") and Robert V. Donovan, Compensation Consultants, LLC, and Capital Concepts, LLC (collectively, "**Donovan Parties**", with HSM, the "**Parties**"). The Parties previously entered into a Tolling Agreement dated October 19, 2016 (the "**Tolling Agreement**"), which, as amended, is scheduled to expire on October 19, 2017. The Parties wish to extend the automatic expiration of the Tolling Agreement for three months, through and including January 19, 2018. Except as expressly amended herein, the terms of the Tolling Agreement remain in effect.

This the _10th_ day of October, 2017.

HICKORY SPRINGS MANUFACTURING COMPANY

By: _____

Ross R. Fulton, as Attorney for Hickory Springs Manufacturing Company

COMPENSATION CONSULTANTS, LLC

By: _____

Jacob Wellman, its Attorney

CAPITAL CONCEPTS, LLC

By: _____

Jacob Wellman, its Attorney

ROBERT V. DONOVAN, individually

By: _____

Jacob Wellman, his Attorney

{00304664 v 1 }

FILED

2018 MAY 30 P 2:52

CATAWBA CO.,C.S.C.
BY



# Penn Mutual

*A better way of life*

## Composite Illustrations
## For 10 Participants
## Of
## Hickory Springs Manufacturing Corp.'s
## Supplemental Executive Retirement Plan

*Presented by*

**Robert V. Donovan , CLU, ChFC, CFP**
Capital Concepts, LLC
1155 Southgate Corporate Park SW
P.O. Box 3509
Hickory, North Carolina 28603

Business: 828-322-8210 Ext: 412

May 31, 2012



EXHIBIT



# The Penn Mutual Life Insurance Company

*A better way of life*

For use in North Carolina.
Supplemental Executive Retirement Plan Composite Cash Flow

Initial Face Amount: $13,629,695
Initial Total Outlay: $1,027,099.91

For 10 Participant(s) Presented By: Robert V. Donovan , CLU, ChFC, CFP

## Composite Summary Of Plan Costs

| | | | Plan Costs | | | | Values On Death | | | Values if Alive | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) End of Year | (2) Num. EE's Left | (3) Net Insurance Cash Flow | (4) Net Annual Cost of Benefits | (5) Total Net Annual Outlay (2+3) | (6) Cumulative Net Cost | (7) Pres Val Survivor Liability | (8) Total Plan Costs (5+6) | (9) Net Death Benefit | (10) Cumulative Gain/Loss on Death | (11) After-Tax Policy Rate of Return | (12) Net Asset Value | (13) Accum'd Charge to Earnings Cash Meth | Accum'd Charge to Earnings APB-12 |
| 1 | 10 | 1,027,100 | 0 | 1,027,100 | 1,027,100 | 0 | 1,027,100 | 14,094,111 | 13,067,011 | 1,272.22 | 998,001 | 29,099 | 1,561,001 |
| 2 | 10 | 1,027,100 | 108,000 | 1,135,100 | 2,162,200 | 972,000 | 3,134,200 | 14,547,775 | 11,413,575 | 229.66 | 2,030,473 | 131,727 | 2,375,559 |
| 3 | 10 | 1,027,100 | 108,000 | 1,135,100 | 3,297,300 | 864,000 | 4,161,300 | 15,027,300 | 10,866,010 | 103.66 | 2,982,821 | 314,479 | 3,320,076 |
| 4 | 10 | 1,027,100 | 108,000 | 1,135,100 | 4,432,400 | 756,000 | 5,188,400 | 15,533,825 | 10,345,426 | 61.10 | 3,893,150 | 539,249 | 4,359,935 |
| 5 | 10 | 1,027,100 | 108,000 | 1,135,100 | 5,567,500 | 648,000 | 6,215,500 | 16,068,496 | 9,852,997 | 40.80 | 4,751,958 | 815,541 | 5,508,371 |
| 6 | 10 | 1,027,100 | 252,000 | 1,279,100 | 6,846,599 | 1,836,000 | 8,682,599 | 16,585,277 | 7,902,678 | 29.18 | 5,737,508 | 1,109,092 | 6,392,853 |
| 7 | 10 | 1,027,100 | 252,000 | 1,279,100 | 8,125,699 | 1,584,000 | 9,709,699 | 17,264,909 | 7,555,209 | 22.07 | 7,051,779 | 1,073,921 | 6,989,979 |
| 8 | 10 | 277,100 | 552,000 | 829,100 | 8,954,799 | 4,032,000 | 12,986,799 | 17,668,918 | 4,682,119 | 17.97 | 7,670,627 | 1,284,172 | 7,295,265 |
| 9 | 10 | 277,100 | 552,000 | 829,100 | 9,783,899 | 3,480,000 | 13,263,899 | 18,092,603 | 4,828,703 | 15.12 | 8,321,057 | 1,462,842 | 7,575,622 |
| 10 | 10 | 277,100 | 552,000 | 829,100 | 10,612,999 | 2,928,000 | 13,540,999 | 18,534,897 | 4,993,897 | 13.04 | 9,006,950 | 1,606,049 | 7,827,635 |
| 11 | 10 | -67,300 | 672,000 | 604,700 | 11,217,699 | 3,456,000 | 14,673,699 | 18,765,158 | 4,091,458 | 11.57 | 9,394,729 | 1,822,971 | 7,967,306 |
| 12 | 9 | -1,835,940 | 618,000 | -1,217,940 | 9,999,760 | 3,378,000 | 13,377,760 | 17,218,811 | 3,841,052 | 10.55 | 8,811,642 | 1,188,118 | 7,281,863 |
| 13 | 9 | -469,500 | 762,000 | 292,500 | 10,292,260 | 4,056,000 | 14,348,260 | 16,956,615 | 2,608,355 | 9.69 | 8,835,362 | 1,456,897 | 7,281,935 |
| 14 | 9 | -701,500 | 906,000 | 204,500 | 10,496,760 | 5,310,000 | 15,806,760 | 16,339,182 | 532,422 | 8.95 | 8,620,211 | 1,876,549 | 7,190,312 |
| 15 | 9 | -803,000 | 978,000 | 175,000 | 10,671,760 | 5,052,000 | 15,723,760 | 15,538,012 | -185,748 | 8.32 | 8,287,978 | 2,383,782 | 7,049,446 |
| 16 | 9 | -803,000 | 834,000 | 31,000 | 10,702,760 | 4,218,000 | 14,920,760 | 14,685,866 | -234,894 | 7.78 | 7,938,588 | 2,764,172 | 6,890,451 |
| 17 | 9 | -803,000 | 834,000 | 31,000 | 10,733,760 | 3,384,000 | 14,117,760 | 13,779,059 | -338,701 | 7.31 | 7,571,998 | 3,161,762 | 6,710,898 |
| 18 | 9 | -503,000 | 534,000 | 31,000 | 10,764,760 | 2,850,000 | 13,614,760 | 13,177,942 | -436,817 | 6.91 | 7,507,566 | 3,257,194 | 6,509,788 |
| 19 | 9 | -503,000 | 534,000 | 31,000 | 10,795,760 | 2,316,000 | 13,111,760 | 12,593,585 | -518,175 | 6.57 | 7,446,207 | 3,349,552 | 6,284,863 |
| 20 | 9 | -503,000 | 534,000 | 31,000 | 10,826,760 | 1,782,000 | 12,608,760 | 11,971,364 | -637,395 | 6.27 | 7,389,353 | 3,437,407 | 6,033,188 |
| 21 | 9 | -558,000 | 558,000 | 0 | 10,826,760 | 2,664,000 | 13,490,760 | 11,176,869 | -2,313,891 | 5.96 | 7,283,270 | 3,543,490 | 5,723,916 |
| 22 | 8 | -3,655,112 | 504,000 | -3,151,112 | 7,675,648 | 2,160,000 | 9,835,648 | 7,222,795 | -2,612,853 | 5.73 | 5,644,704 | 2,030,944 | 3,824,720 |
| 23 | 7 | -1,422,903 | 360,000 | -1,062,903 | 6,612,745 | 1,800,000 | 8,412,745 | 5,816,047 | -2,596,698 | 5.63 | 4,679,140 | 1,933,605 | 3,467,745 |
| 24 | 7 | -360,000 | 360,000 | 0 | 6,612,745 | 1,440,000 | 8,052,745 | 5,723,085 | -2,329,660 | 5.62 | 4,713,819 | 1,898,927 | 3,155,257 |
| 25 | 6 | -2,473,416 | 288,000 | -2,185,416 | 4,427,329 | 1,152,000 | 5,579,329 | 3,372,237 | -2,207,093 | 5.60 | 2,610,921 | 1,816,408 | 2,852,521 |
| 26 | 6 | -288,000 | 288,000 | 0 | 4,427,329 | 864,000 | 5,291,329 | 3,378,933 | -1,912,396 | 5.64 | 2,597,649 | 1,829,680 | 2,630,161 |
| 27 | 6 | -288,000 | 288,000 | 0 | 4,427,329 | 576,000 | 5,003,329 | 3,391,656 | -1,611,673 | 5.66 | 2,591,393 | 1,835,936 | 2,384,291 |
| 28 | 6 | -288,000 | 288,000 | 0 | 4,427,329 | 288,000 | 4,715,329 | 3,410,305 | -1,305,024 | 5.69 | 2,592,359 | 1,834,970 | 2,113,550 |
| 29 | 6 | -144,000 | 144,000 | 0 | 4,427,329 | 144,000 | 4,571,329 | 3,587,566 | -983,765 | 5.72 | 2,753,561 | 1,673,768 | 1,817,768 |
| 30 | 5 | -1,130,216 | 144,000 | -986,216 | 3,441,113 | 0 | 3,441,113 | 2,744,648 | -696,465 | 5.75 | 2,046,702 | 1,394,411 | 1,394,411 |

All After Tax Outlays and Proceeds are Compounded at 0.00% (0.00% Before Tax).
Remaining Benefit Liabilities are Discounted at 0.00% (0.00% Before Tax).
The After Tax Policy Rate of Return for the Death Benefit is the rate at which the outlays up to that year must be compounded to generate the indicated Death Benefit.
The Company's marginal tax rate is 40.00%.
The after tax costs shown in this illustration do not reflect any Alternate Minimum Tax which may be due. Consult with your tax advisor with respect to your particular situation.

This Supplemental Illustration is not valid unless accompanied by the Basic Life Insurance Illustrations dated 05/31/2012 which include both Guaranteed and Non-Guaranteed elements and other important information about the Life Insurance Policy.

## Composite Summary Of Plan Costs

| (1) End of Year | Num. EE's Left | (2) Net Insurance Cash Flow | (3) Net Annual Cost of Benefits | (4) Total Net Annual Outlay | (5) Cumulative Net Cost | (6) Pres Val Survivor Liability | (7) Total Plan Costs | (8) Net Death Benefit | (9) Cumulative Gain/Loss on Death | (10) After-Tax Policy Rate of Return | (11) Net Asset Value | (12) Accum'd Charge to Earnings Cash Meth | (13) Accum'd Charge to Earnings APB-12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (2+3) | | | (5+6) | | | | | | |
| 31 | 4 | -377,293 | 0 | -377,293 | 3,063,820 | 0 | 3,063,820 | 2,640,245 | -423,575 | 5.77 | 1,977,576 | 1,086,244 | 1,086,244 |
| 32 | 3 | -899,971 | 0 | -899,971 | 2,163,849 | 0 | 2,163,849 | 1,939,967 | -223,882 | 5.79 | 1,450,001 | 713,848 | 713,848 |
| 33 | 2 | -1,148,060 | 0 | -1,148,060 | 1,015,789 | 0 | 1,015,789 | 886,986 | -128,803 | 5.80 | 649,712 | 366,077 | 366,077 |
| 34 | 2 | 0 | 0 | 0 | 1,015,789 | 0 | 1,015,789 | 990,252 | -25,536 | 5.80 | 736,359 | 279,430 | 279,430 |
| 35 | 2 | 0 | 0 | 0 | 1,015,789 | 0 | 1,015,789 | 1,102,094 | 86,305 | 5.81 | 830,470 | 185,319 | 185,319 |
| 36 | 2 | 0 | 0 | 0 | 1,015,789 | 0 | 1,015,789 | 1,222,915 | 207,127 | 5.82 | 932,389 | 83,399 | 83,399 |
| 37 | 2 | 0 | 0 | 0 | 1,015,789 | 0 | 1,015,789 | 1,353,146 | 337,357 | 5.83 | 1,042,481 | -26,692 | -26,692 |
| 38 | 1 | -643,011 | 0 | -643,011 | 372,777 | 0 | 372,777 | 788,541 | 415,764 | 5.83 | 598,292 | -225,515 | -225,515 |
| 39 | 1 | 0 | 0 | 0 | 372,777 | 0 | 372,777 | 873,194 | 500,417 | 5.83 | 669,752 | -296,975 | -296,975 |
| 40 | | -873,194 | 0 | -873,194 | -500,417 | 0 | -500,417 | 0 | 500,417 | | 0 | -500,417 | -500,417 |
| | | -13,520,417 | 13,020,000 | -500,417 | | | | | | | | | |

All After Tax Outlays and Proceeds are Compounded at 0.00% (0.00% Before Tax).
Remaining Benefit Liabilities are Discounted at 0.00% (0.00% Before Tax).
The After Tax Policy Rate of Return for the Death Benefit is the rate at which the outlays up to that year must be compounded to generate the indicated Death Benefit.
The Company's marginal tax rate is 40.00%.
The after tax costs shown in this illustration do not reflect any Alternate Minimum Tax which may be due. Consult with your tax advisor with respect to your particular situation.

# Composite Summary Of Insurance Costs

| End of Year | Num. EE's Left | Annual Premium | Policy Loan | Capitalized Loan Interest | Net Insurance Cost | Total Insurance Cost | Net Asset Value | Annual Increase in Asset Value | Total Net Death Benefit | Net Death Benefit Received | Net Insurance Protection | Interest Adjusted Cost/$ Death Ben. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 10 | 1,027,100 | 0 | 0 | 1,027,100 | 1,027,100 | 998,001 | 998,001 | 14,094,111 | 0 | 13,096,110 | 0.07 |
| 2 | 10 | 1,027,100 | 0 | 0 | 1,027,100 | 2,054,200 | 2,030,473 | 1,032,472 | 14,547,775 | 0 | 12,517,302 | 0.14 |
| 3 | 10 | 1,027,100 | 0 | 0 | 1,027,100 | 3,081,300 | 2,982,821 | 952,348 | 15,027,309 | 0 | 12,044,489 | 0.21 |
| 4 | 10 | 1,027,100 | 0 | 0 | 1,027,100 | 4,108,400 | 3,893,150 | 910,329 | 15,533,825 | 0 | 11,640,675 | 0.26 |
| 5 | 10 | 1,027,100 | 0 | 0 | 1,027,100 | 5,135,500 | 4,751,958 | 858,808 | 16,068,496 | 0 | 11,316,538 | 0.32 |
| 6 | 10 | 1,027,100 | 0 | 0 | 1,027,100 | 6,162,599 | 5,737,508 | 985,549 | 16,585,277 | 0 | 10,847,769 | 0.37 |
| 7 | 10 | 1,027,100 | 0 | 0 | 1,027,100 | 7,189,699 | 7,051,779 | 1,314,271 | 17,264,909 | 0 | 10,213,130 | 0.42 |
| 8 | 10 | 577,100 | 300,000 | 0 | 277,100 | 7,466,799 | 7,670,627 | 618,848 | 17,668,918 | 0 | 9,998,291 | 0.42 |
| 9 | 10 | 577,100 | 300,000 | 18,000 | 277,100 | 7,743,899 | 8,321,057 | 650,430 | 18,092,603 | 0 | 9,771,545 | 0.43 |
| 10 | 10 | 577,100 | 300,000 | 37,080 | 277,100 | 8,020,999 | 9,006,950 | 685,893 | 18,534,897 | 0 | 9,527,947 | 0.43 |
| 11 | 10 | 352,700 | 420,000 | 57,305 | -67,300 | 7,953,699 | 9,394,729 | 387,779 | 18,765,158 | 0 | 9,370,429 | 0.42 |
| 12 | 9 | 223,500 | 474,000 | 85,943 | -1,835,940 | 6,117,760 | 8,811,642 | -583,087 | 17,218,811 | 1,585,440 | 8,407,170 | 0.36 |
| 13 | 9 | 148,500 | 618,000 | 119,540 | -469,500 | 5,648,260 | 8,835,362 | 23,721 | 16,956,615 | 0 | 8,121,253 | 0.33 |
| 14 | 9 | 60,500 | 762,000 | 163,792 | -701,500 | 4,946,760 | 8,620,211 | -215,151 | 16,339,182 | 0 | 7,718,971 | 0.30 |
| 15 | 9 | 31,000 | 834,000 | 219,340 | -803,000 | 4,143,760 | 8,287,978 | -332,233 | 15,538,012 | 0 | 7,250,034 | 0.27 |
| 16 | 9 | 31,000 | 834,000 | 282,540 | -803,000 | 3,340,760 | 7,938,588 | -349,390 | 14,685,866 | 0 | 6,747,279 | 0.23 |
| 17 | 9 | 31,000 | 834,000 | 349,532 | -803,000 | 2,537,760 | 7,571,998 | -366,590 | 13,779,059 | 0 | 6,207,061 | 0.18 |
| 18 | 9 | 31,000 | 534,000 | 420,544 | -503,000 | 2,034,760 | 7,507,566 | -64,432 | 13,177,942 | 0 | 5,670,377 | 0.15 |
| 19 | 9 | 31,000 | 534,000 | 477,817 | -503,000 | 1,531,760 | 7,446,207 | -61,358 | 12,593,585 | 0 | 5,147,377 | 0.12 |
| 20 | 9 | 31,000 | 534,000 | 538,526 | -503,000 | 1,028,760 | 7,389,353 | -56,854 | 11,971,364 | 0 | 4,582,011 | 0.09 |
| 21 | 9 | 0 | 558,000 | 602,878 | -558,000 | 470,760 | 7,283,270 | -106,083 | 11,176,869 | 0 | 3,893,599 | 0.04 |
| 22 | 8 | 0 | 504,000 | 373,002 | -3,655,112 | -3,184,352 | 5,644,704 | -1,638,567 | 7,222,795 | 3,151,112 | 1,578,091 | -0.44 |
| 23 | 7 | 0 | 360,000 | 425,622 | -1,422,903 | -4,607,255 | 4,679,140 | -965,563 | 5,816,047 | 1,062,903 | 1,136,907 | -0.79 |
| 24 | 7 | 0 | 360,000 | 472,760 | -360,000 | -4,967,255 | 4,713,819 | 34,678 | 5,723,085 | 0 | 1,009,267 | -0.87 |
| 25 | 6 | 0 | 288,000 | 522,725 | -2,473,416 | -7,440,671 | 2,610,921 | -2,102,898 | 3,372,237 | 2,185,416 | 761,316 | -2.21 |
| 26 | 6 | 0 | 288,000 | 571,369 | -288,000 | -7,728,671 | 2,597,649 | -13,272 | 3,378,933 | 0 | 781,284 | -2.29 |
| 27 | 6 | 0 | 288,000 | 622,931 | -288,000 | -8,016,671 | 2,591,393 | -6,256 | 3,391,656 | 0 | 800,263 | -2.36 |
| 28 | 6 | 0 | 288,000 | 677,587 | -288,000 | -8,304,671 | 2,592,359 | 966 | 3,410,305 | 0 | 817,946 | -2.44 |
| 29 | 6 | 0 | 144,000 | 735,522 | -144,000 | -8,448,671 | 2,753,561 | 161,202 | 3,587,565 | 0 | 834,004 | -2.35 |
| 30 | 5 | 0 | 144,000 | 627,959 | -1,130,216 | -9,578,887 | 2,046,702 | -706,859 | 2,744,648 | 986,216 | 697,946 | -3.49 |
| 31 | 4 | 0 | 0 | 602,126 | -377,293 | -9,956,180 | 1,977,576 | -69,126 | 2,640,245 | 377,293 | 662,669 | -3.77 |
| 32 | 3 | 0 | 0 | 445,852 | -899,971 | -10,856,151 | 1,450,001 | -527,575 | 1,939,967 | 899,971 | 489,966 | -5.60 |
| 33 | 2 | 0 | 0 | 218,713 | -1,148,060 | -12,004,211 | 649,712 | -800,290 | 886,986 | 1,148,060 | 237,274 | -13.53 |
| 34 | 2 | 0 | 0 | 231,836 | 0 | -12,004,211 | 736,359 | 86,647 | 990,252 | 0 | 253,894 | -12.12 |
| 35 | 2 | 0 | 0 | 245,746 | 0 | -12,004,211 | 830,470 | 94,111 | 1,102,094 | 0 | 271,624 | -10.89 |

All After Tax Outlays and Proceeds are Compounded at 0.00% (0.00% Before Tax).
The Company's marginal tax rate is 40.00%.
The Technical and Miscellaneous Revenue Act (TAMRA) has created a class of policies known as modified endowments. Please refer to the individual illustrations for further information.
The after tax costs shown in this illustration do not reflect any Alternate Minimum Tax which may be due. Consult with your tax advisor with respect to your particular situation.

## Composite Summary Of Insurance Costs

| End of Year | Num. EE's Left | Annual Premium | Policy Loan | Capitalized Loan Interest | Net Insurance Cost | Total Insurance Cost | Net Asset Value | Annual Increase in Asset Value | Total Net Death Benefit | Net Death Benefit Received | Net Insurance Protection | Interest Adjusted Cost/$ Death Ben. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 36 | 2 | 0 | 0 | 260,491 | 0 | -12,004,211 | 932,389 | 101,920 | 1,222,915 | 0 | 290,526 | -9.82 |
| 37 | 2 | 0 | 0 | 276,120 | 0 | -12,004,211 | 1,042,481 | 110,091 | 1,353,146 | 0 | 310,665 | -8.87 |
| 38 | 1 | 0 | 0 | 171,237 | -643,011 | -12,647,223 | 598,292 | -444,189 | 788,541 | 643,011 | 190,249 | -16.04 |
| 39 | 1 | 0 | 0 | 181,511 | 0 | -12,647,223 | 669,752 | 71,460 | 873,194 | 0 | 203,442 | -14.48 |
| 40 | | 0 | 0 | 0 | -873,194 | -13,520,417 | 0 | -669,752 | 0 | 873,194 | 0 | |
| | | 9,892,199 | 10,500,000 | 11,035,943 | -13,520,417 | | | 0 | | 12,912,616 | | |

All After Tax Outlays and Proceeds are Compounded at 0.00% (0.00% Before Tax).
The Company's marginal tax rate is 40.00%.
The Technical and Miscellaneous Revenue Act (TAMRA) has created a class of policies known as modified endowments. Please refer to the individual illustrations for further information.
The after tax costs shown in this illustration do not reflect any Alternate Minimum Tax which may be due. Consult with your tax advisor with respect to your particular situation.

## Composite Summary Of Company Benefit Costs

| End of Year | Num. EE's Left | Annual Pre-Tax Retirement Benefit | Annual Tax Savings | Net Annual Cost Of Benefits | Cumulative Benefits Cash Flow at 0.00% | Pres Val Survivor Liability at 0.00% | Total Cost Of Benefits |
|---|---|---|---|---|---|---|---|
| 1 | 10 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 | 10 | 180,000 | 72,000 | 108,000 | 108,000 | 972,000 | 1,080,000 |
| 3 | 10 | 180,000 | 72,000 | 108,000 | 216,000 | 864,000 | 1,080,000 |
| 4 | 10 | 180,000 | 72,000 | 108,000 | 324,000 | 756,000 | 1,080,000 |
| 5 | 10 | 180,000 | 72,000 | 108,000 | 432,000 | 648,000 | 1,080,000 |
| 6 | 10 | 420,000 | 168,000 | 252,000 | 684,000 | 1,836,000 | 2,520,000 |
| 7 | 10 | 420,000 | 168,000 | 252,000 | 936,000 | 1,584,000 | 2,520,000 |
| 8 | 10 | 920,000 | 368,000 | 552,000 | 1,488,000 | 4,032,000 | 5,520,000 |
| 9 | 10 | 920,000 | 368,000 | 552,000 | 2,040,000 | 3,480,000 | 5,520,000 |
| 10 | 10 | 920,000 | 368,000 | 552,000 | 2,592,000 | 2,928,000 | 5,520,000 |
| 11 | 10 | 1,120,000 | 448,000 | 672,000 | 3,264,000 | 3,456,000 | 6,720,000 |
| 12 | 9 | 1,030,000 | 412,000 | 618,000 | 3,882,000 | 3,378,000 | 7,260,000 |
| 13 | 9 | 1,270,000 | 508,000 | 762,000 | 4,644,000 | 4,056,000 | 8,700,000 |
| 14 | 9 | 1,510,000 | 604,000 | 906,000 | 5,550,000 | 5,310,000 | 10,860,000 |
| 15 | 9 | 1,630,000 | 652,000 | 978,000 | 6,528,000 | 5,052,000 | 11,580,000 |
| 16 | 9 | 1,390,000 | 556,000 | 834,000 | 7,362,000 | 4,218,000 | 11,580,000 |
| 17 | 9 | 1,390,000 | 556,000 | 834,000 | 8,196,000 | 3,384,000 | 11,580,000 |
| 18 | 9 | 890,000 | 356,000 | 534,000 | 8,730,000 | 2,850,000 | 11,580,000 |
| 19 | 9 | 890,000 | 356,000 | 534,000 | 9,264,000 | 2,316,000 | 11,580,000 |
| 20 | 9 | 890,000 | 356,000 | 534,000 | 9,798,000 | 1,782,000 | 11,580,000 |
| 21 | 9 | 930,000 | 372,000 | 558,000 | 10,356,000 | 2,664,000 | 13,020,000 |
| 22 | 8 | 840,000 | 336,000 | 504,000 | 10,860,000 | 2,160,000 | 13,020,000 |
| 23 | 7 | 600,000 | 240,000 | 360,000 | 11,220,000 | 1,800,000 | 13,020,000 |
| 24 | 7 | 600,000 | 240,000 | 360,000 | 11,580,000 | 1,440,000 | 13,020,000 |
| 25 | 6 | 480,000 | 192,000 | 288,000 | 11,868,000 | 1,152,000 | 13,020,000 |
| 26 | 6 | 480,000 | 192,000 | 288,000 | 12,156,000 | 864,000 | 13,020,000 |
| 27 | 6 | 480,000 | 192,000 | 288,000 | 12,444,000 | 576,000 | 13,020,000 |
| 28 | 6 | 480,000 | 192,000 | 288,000 | 12,732,000 | 288,000 | 13,020,000 |
| 29 | 6 | 240,000 | 96,000 | 144,000 | 12,876,000 | 144,000 | 13,020,000 |
| 30 | 5 | 240,000 | 96,000 | 144,000 | 13,020,000 | 0 | 13,020,000 |
| | | 21,700,000 | 8,680,000 | 13,020,000 | | | |

All After Tax Outlays and Proceeds are Compounded at 0.00% (0.00% Before Tax).
Remaining Benefit Liabilities are Discounted at 0.00% (0.00% Before Tax).
The Company's marginal tax rate is 40.00%.

# Composite Charge To Earnings Analysis

|  |  |  |  | Cash Method | | | | APB-12 Accrual Method | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) End of Year | Num. EE's Left | (2) Net Insurance Cash Flow | (3) Annual Increase in Asset Value | (4) Annual Insurance Charge to Earnings (2-3) | (5) Incremental After-Tax Benefit Expense | (6) Tot Ann Charge to Earnings Cash Meth (4+5) | (7) Accum'd Charge to Earnings Cash Meth | (8) Annual Benefit Accrual | (9) Total Accrued Benefit Liability | (10) Total Ann Charge to Earnings Accrual | (11) Accum'd Charge to Earnings Accrual |
| 1 | 10 | 1,027,100 | 998,001 | 29,099 | 0 | 29,099 | 29,099 | 1,531,902 | 1,531,902 | 1,561,001 | 1,561,001 |
| 2 | 10 | 1,027,100 | 1,032,472 | -5,372 | 108,000 | 102,628 | 131,727 | 819,930 | 2,243,832 | 814,558 | 2,375,559 |
| 3 | 10 | 1,027,100 | 952,348 | 74,752 | 108,000 | 182,752 | 314,479 | 869,765 | 3,005,597 | 944,517 | 3,320,076 |
| 4 | 10 | 1,027,100 | 910,329 | 116,771 | 108,000 | 224,771 | 539,249 | 923,089 | 3,820,685 | 1,039,859 | 4,359,935 |
| 5 | 10 | 1,027,100 | 858,808 | 168,292 | 108,000 | 276,292 | 815,541 | 980,145 | 4,692,830 | 1,148,437 | 5,508,371 |
| 6 | 10 | 1,027,100 | 985,549 | 41,550 | 252,000 | 293,550 | 1,109,092 | 842,932 | 5,283,762 | 884,482 | 6,392,853 |
| 7 | 10 | 1,027,100 | 1,314,271 | -287,171 | 252,000 | -35,171 | 1,073,921 | 884,297 | 5,916,058 | 597,126 | 6,989,979 |
| 8 | 10 | 277,100 | 618,848 | -341,748 | 552,000 | 210,252 | 1,284,172 | 647,035 | 6,011,093 | 305,286 | 7,295,265 |
| 9 | 10 | 277,100 | 650,430 | -373,330 | 552,000 | 178,670 | 1,462,842 | 653,687 | 6,112,780 | 280,357 | 7,575,622 |
| 10 | 10 | 277,100 | 685,893 | -408,793 | 552,000 | 143,207 | 1,606,049 | 660,805 | 6,221,585 | 252,013 | 7,827,635 |
| 11 | 10 | -67,300 | 387,779 | -455,079 | 672,000 | 216,921 | 1,822,971 | 594,750 | 6,144,335 | 139,671 | 7,967,306 |
| 12 | 9 | -1,835,940 | -583,087 | -1,252,853 | 618,000 | -634,853 | 1,188,118 | 567,410 | 6,093,745 | -685,442 | 7,281,863 |
| 13 | 9 | -469,500 | 23,721 | -493,221 | 762,000 | 268,779 | 1,456,897 | 493,292 | 5,825,038 | 72 | 7,281,935 |
| 14 | 9 | -701,500 | -215,151 | -486,349 | 906,000 | 419,651 | 1,876,549 | 394,725 | 5,313,763 | -91,623 | 7,190,312 |
| 15 | 9 | -803,000 | -332,233 | -470,767 | 978,000 | 507,233 | 2,383,782 | 329,901 | 4,665,664 | -140,866 | 7,049,446 |
| 16 | 9 | -803,000 | -349,390 | -453,610 | 834,000 | 380,390 | 2,764,172 | 294,614 | 4,126,279 | -158,995 | 6,890,451 |
| 17 | 9 | -803,000 | -366,590 | -436,410 | 834,000 | 397,590 | 3,161,762 | 256,857 | 3,549,136 | -179,553 | 6,710,898 |
| 18 | 9 | -503,000 | -64,432 | -438,568 | 534,000 | 95,432 | 3,257,194 | 237,457 | 3,252,594 | -201,110 | 6,509,788 |
| 19 | 9 | -503,000 | -61,358 | -441,642 | 534,000 | 92,358 | 3,349,552 | 216,699 | 2,935,293 | -224,942 | 6,284,845 |
| 20 | 9 | -503,000 | -56,854 | -446,146 | 534,000 | 87,854 | 3,437,407 | 194,488 | 2,595,781 | -251,657 | 6,033,188 |
| 21 | 9 | -558,000 | -106,083 | -451,917 | 558,000 | 106,083 | 3,543,490 | 142,645 | 2,180,426 | -309,273 | 5,723,916 |
| 22 | 8 | -3,655,112 | -1,638,567 | -2,016,545 | 504,000 | -1,512,545 | 2,030,944 | 117,350 | 1,793,776 | -1,899,195 | 3,824,720 |
| 23 | 7 | -1,422,903 | -965,563 | -457,339 | 360,000 | -97,339 | 1,933,605 | 100,364 | 1,534,140 | -356,975 | 3,467,745 |
| 24 | 7 | -360,000 | 34,678 | -394,678 | 360,000 | -34,678 | 1,898,927 | 82,190 | 1,256,330 | -312,489 | 3,155,257 |
| 25 | 6 | -2,473,416 | -2,102,898 | -370,518 | 288,000 | -82,518 | 1,816,408 | 67,783 | 1,036,113 | -302,735 | 2,852,521 |
| 26 | 6 | -288,000 | -13,272 | -274,728 | 288,000 | 13,272 | 1,829,680 | 52,368 | 800,481 | -222,360 | 2,630,161 |
| 27 | 6 | -288,000 | -6,256 | -281,744 | 288,000 | 6,256 | 1,835,936 | 35,874 | 548,355 | -245,871 | 2,384,291 |
| 28 | 6 | -288,000 | 966 | -288,966 | 288,000 | -966 | 1,834,970 | 18,225 | 278,579 | -270,741 | 2,113,550 |
| 29 | 6 | -144,000 | 161,202 | -305,202 | 144,000 | -161,202 | 1,673,768 | 9,421 | 144,000 | -295,782 | 1,817,768 |
| 30 | 5 | -1,130,216 | -706,859 | -423,357 | 144,000 | -279,357 | 1,394,411 | 0 | 0 | -423,357 | 1,394,411 |
| 31 | 4 | -377,293 | -69,126 | -308,167 | 0 | -308,167 | 1,086,244 | 0 | 0 | -308,167 | 1,086,244 |
| 32 | 3 | -899,971 | -527,575 | -372,396 | 0 | -372,396 | 713,848 | 0 | 0 | -372,396 | 713,848 |
| 33 | 2 | -1,148,060 | -800,290 | -347,770 | 0 | -347,770 | 366,077 | 0 | 0 | -347,770 | 366,077 |
| 34 | 2 | 0 | 86,647 | -86,647 | 0 | -86,647 | 279,430 | 0 | 0 | -86,647 | 279,430 |
| 35 | 2 | 0 | 94,111 | -94,111 | 0 | -94,111 | 185,319 | 0 | 0 | -94,111 | 185,319 |

The Accrual Method Discounts at a Rate of 7.00%.
The Company's marginal tax rate is 40.00%.
The after tax costs shown in this illustration do not reflect any Alternate Minimum Tax which may be due. Consult with your tax advisor with respect to your particular situation.

## Composite Charge To Earnings Analysis

| | | | | | Cash Method | | | APB-12 Accrual Method | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) End of Year | Num. EE's Left | (2) Net Insurance Cash Flow | (3) Annual Increase in Asset Value | (4) Annual Insurance Charge to Earnings | (5) Incremental After-Tax Benefit Expense | (6) Tot Ann Charge to Earnings Cash Meth | (7) Accum'd Charge to Earnings Cash Meth | (8) Annual Benefit Accrual | (9) Total Accrued Benefit Liability | (10) Total Ann Charge to Earnings Accrual | (11) Accum'd Charge to Earnings Accrual |
| | | | | (2-3) | | (4+5) | | | | | |
| 36 | 2 | 0 | 101,920 | -101,920 | 0 | -101,920 | 83,399 | 0 | 0 | -101,920 | 83,399 |
| 37 | 2 | 0 | 110,091 | -110,091 | 0 | -110,091 | -26,692 | 0 | 0 | -110,091 | -26,692 |
| 38 | 1 | -643,011 | -444,189 | -198,822 | 0 | -198,822 | -225,515 | 0 | 0 | -198,822 | -225,515 |
| 39 | 1 | 0 | 71,460 | -71,460 | 0 | -71,460 | -296,975 | 0 | 0 | -71,460 | -296,975 |
| 40 | | -873,194 | -669,752 | -203,442 | 0 | -203,442 | -500,417 | 0 | 0 | -203,442 | -500,417 |
| | | -13,520,417 | 0 | -13,520,417 | 13,020,000 | -500,417 | | 13,020,000 | | -500,417 | |

The Accrual Method Discounts at a Rate of 7.00%.
The Company's marginal tax rate is 40.00%.
The after tax costs shown in this illustration do not reflect any Alternate Minimum Tax which may be due.  Consult with your tax advisor with respect to your particular situation.

# Composite Accrued Benefit Liability Breakdown

(1)

| End of Year | Num. EE's Left | ========APB-12 Accrual Method======== | | | | | ========FASB Accrual Method======== | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Base Accrual APB | Interest Accrual APB | Deferred Tax Assets | Annual Accrual APB | Accrual Account APB | Base Accrual FASB | Interest Accrual FASB | Deferred Tax Assets | Annual Accrual FASB | Accrual Account FASB |
| 1 | 10 | 2,386,140 | 167,030 | 1,021,268 | 1,531,902 | 1,531,902 | 2,151,037 | 150,573 | 920,644 | 1,380,966 | 1,380,966 |
| 2 | 10 | 1,121,895 | 244,655 | 546,620 | 819,930 | 2,243,832 | 948,868 | 214,933 | 465,520 | 698,281 | 1,971,246 |
| 3 | 10 | 1,121,895 | 327,713 | 579,843 | 869,765 | 3,005,597 | 1,015,289 | 288,449 | 521,495 | 782,243 | 2,645,489 |
| 4 | 10 | 1,121,895 | 416,586 | 615,392 | 923,089 | 3,820,685 | 1,086,359 | 372,085 | 583,378 | 875,067 | 3,412,556 |
| 5 | 10 | 1,121,895 | 511,679 | 653,430 | 980,145 | 4,692,830 | 1,162,404 | 466,900 | 651,721 | 977,582 | 4,282,138 |
| 6 | 10 | 828,775 | 576,111 | 561,954 | 842,932 | 5,283,762 | 883,041 | 531,996 | 566,015 | 849,022 | 4,879,160 |
| 7 | 10 | 828,775 | 645,053 | 589,531 | 884,297 | 5,916,058 | 944,854 | 605,975 | 620,332 | 930,497 | 5,557,657 |
| 8 | 10 | 422,976 | 655,415 | 431,356 | 647,035 | 6,011,093 | 474,191 | 617,187 | 436,551 | 654,827 | 5,660,484 |
| 9 | 10 | 422,976 | 666,503 | 435,791 | 653,687 | 6,112,780 | 507,385 | 631,507 | 455,557 | 683,335 | 5,791,819 |
| 10 | 10 | 422,976 | 678,366 | 440,537 | 660,805 | 6,221,585 | 542,902 | 649,315 | 476,887 | 715,330 | 5,955,149 |
| 11 | 10 | 321,306 | 669,943 | 396,500 | 594,750 | 6,144,335 | 430,600 | 646,509 | 430,844 | 646,266 | 5,929,415 |
| 12 | 9 | 281,257 | 664,427 | 378,274 | 567,410 | 6,093,745 | 399,254 | 647,613 | 418,747 | 628,120 | 5,939,535 |
| 13 | 9 | 187,025 | 635,129 | 328,862 | 493,292 | 5,825,038 | 276,897 | 623,428 | 360,130 | 540,195 | 5,717,730 |
| 14 | 9 | 78,493 | 579,382 | 263,150 | 394,725 | 5,313,763 | 116,363 | 569,514 | 274,351 | 411,526 | 5,223,256 |
| 15 | 9 | 41,118 | 508,717 | 219,934 | 329,901 | 4,665,664 | 60,093 | 499,486 | 223,832 | 335,747 | 4,581,004 |
| 16 | 9 | 41,118 | 449,906 | 196,410 | 294,614 | 4,126,279 | 64,299 | 441,651 | 202,380 | 303,570 | 4,050,574 |
| 17 | 9 | 41,118 | 386,977 | 171,238 | 256,857 | 3,549,136 | 68,800 | 380,083 | 179,553 | 269,330 | 3,485,904 |
| 18 | 9 | 41,118 | 354,644 | 158,305 | 237,457 | 3,252,594 | 73,616 | 349,542 | 169,263 | 253,895 | 3,205,798 |
| 19 | 9 | 41,118 | 320,048 | 144,466 | 216,699 | 2,935,293 | 78,769 | 317,224 | 158,397 | 237,596 | 2,909,394 |
| 20 | 9 | 41,118 | 283,029 | 129,659 | 194,488 | 2,595,781 | 84,283 | 283,029 | 146,925 | 220,387 | 2,595,781 |
| 21 | 9 | 0 | 237,741 | 95,096 | 142,645 | 2,180,426 | 0 | 237,741 | 95,096 | 142,645 | 2,180,426 |
| 22 | 8 | 0 | 195,583 | 78,233 | 117,350 | 1,793,776 | 0 | 195,583 | 78,233 | 117,350 | 1,793,776 |
| 23 | 7 | 0 | 167,274 | 66,910 | 100,364 | 1,534,140 | 0 | 167,274 | 66,910 | 100,364 | 1,534,140 |
| 24 | 7 | 0 | 136,983 | 54,793 | 82,190 | 1,256,330 | 0 | 136,983 | 54,793 | 82,190 | 1,256,330 |
| 25 | 6 | 0 | 112,972 | 45,189 | 67,783 | 1,036,113 | 0 | 112,972 | 45,189 | 67,783 | 1,036,113 |
| 26 | 6 | 0 | 87,280 | 34,912 | 52,368 | 800,481 | 0 | 87,280 | 34,912 | 52,368 | 800,481 |
| 27 | 6 | 0 | 59,789 | 23,916 | 35,874 | 548,355 | 0 | 59,789 | 23,916 | 35,874 | 548,355 |
| 28 | 6 | 0 | 30,375 | 12,150 | 18,225 | 278,579 | 0 | 30,375 | 12,150 | 18,225 | 278,579 |
| 29 | 6 | 0 | 15,701 | 6,280 | 9,421 | 144,000 | 0 | 15,701 | 6,280 | 9,421 | 144,000 |
| 30 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | 10,914,990 | 10,785,010 | 8,680,000 | 13,020,000 | | 11,369,303 | 10,330,697 | 8,680,000 | 13,020,000 | |

The Accrual Method Discounts at a Rate of 7.00%.
The Company's marginal tax rate is 40.00%.
The after tax costs shown in this illustration do not reflect any Alternate Minimum Tax which may be due. Consult with your tax advisor with respect to your particular situation.

## Analysis of Alternative Plans

When Hickory Springs Manufacturing Corp. begins contemplating the implementation of a Non-Qualified Benefit Plan, an analysis of alternative plans will illustrate the cost advantages of an informally funded Non-Qualified plan compared with a Qualified Plan or an un-funded plan.

The graphic below enables you to visualize the dramatic differences between alternative plans. Note that the informally funded plan may be designed to be ultimately cost-free. This compares very favorably with a Qualified Plan which has associated costs during the participants' working years and the un-funded plan's costs of benefit payments upon attainment of each employee's retirement age. If Hickory Springs Manufacturing Corp. does not create any plan for retirement benefits, and the salaries are paid rather then deferred, the last column will reflect the expected costs.

Only the informally funded Non-Qualified Plan can be designed to recover some or all costs of the plan on a cumulative basis.

Bar Symbol Descriptions In The Following Graph:
"Our Plan Cumulative Cost" is Hickory Springs Manufacturing Corp.'s cumulative interest adjusted annual costs of the informally funded Non-Qualified Plan at each period shown.
"Qualified Plan Cumulative Cost" is the interest adjusted after-tax costs of annual deductible deposits to a Qualified Plan Pension Trust.
"Pay-As-You-Go Plan Cost" is the interest adjusted costs of a 'Pay-As-You-Go' non-funded plan. In this arrangement, Hickory Springs Manufacturing Corp. would pay the benefits as they fall due during the employees' retirement benefit period.



## Composite Summary Of Plan Comparisons

| (1) End of Year | Num. EE's Left | Insured Plan | | Qualified Plan | | | Pay As You Go | | |
|---|---|---|---|---|---|---|---|---|---|
| | | (2) Total Net Annual Outlay | (3) Cum. Net Cost Compounded At 0.00% | (4) After-Tax Qualified Plan Deposit | (5) Cum. Net Deposit At 0.00% | (6) Our Plan Cumulative Advantage | (7) Net Annual Costs Of Benefits | (8) Cumulative Benefits Cash Flow At 0.00% | (9) Our Plan Cumulative Advantage |
| | | | | | | (5-3) | | | (8-3) |
| 1 | 10 | 1,027,100 | 1,027,100 | 1,431,684 | 1,431,684 | 404,584 | 0 | 0 | -1,027,100 |
| 2 | 10 | 1,135,100 | 2,162,200 | 673,137 | 2,104,821 | -57,379 | 108,000 | 108,000 | -2,054,200 |
| 3 | 10 | 1,135,100 | 3,297,300 | 673,137 | 2,777,958 | -519,341 | 108,000 | 216,000 | -3,081,300 |
| 4 | 10 | 1,135,100 | 4,432,400 | 673,137 | 3,451,096 | -981,304 | 108,000 | 324,000 | -4,108,400 |
| 5 | 10 | 1,135,100 | 5,567,500 | 673,137 | 4,124,233 | -1,443,267 | 108,000 | 432,000 | -5,135,500 |
| 6 | 10 | 1,279,100 | 6,846,599 | 497,265 | 4,621,498 | -2,225,102 | 252,000 | 684,000 | -6,162,599 |
| 7 | 10 | 1,279,100 | 8,125,699 | 497,265 | 5,118,762 | -3,006,937 | 252,000 | 936,000 | -7,189,699 |
| 8 | 10 | 829,100 | 8,954,799 | 253,786 | 5,372,548 | -3,582,251 | 552,000 | 1,488,000 | -7,466,799 |
| 9 | 10 | 829,100 | 9,783,899 | 253,786 | 5,626,334 | -4,157,566 | 552,000 | 2,040,000 | -7,743,899 |
| 10 | 10 | 829,100 | 10,612,999 | 253,786 | 5,880,119 | -4,732,880 | 552,000 | 2,592,000 | -8,020,999 |
| 11 | 10 | 604,700 | 11,217,699 | 192,784 | 6,072,903 | -5,144,796 | 672,000 | 3,264,000 | -7,953,699 |
| 12 | 9 | -1,217,940 | 9,999,760 | 168,754 | 6,241,657 | -3,758,103 | 618,000 | 3,882,000 | -6,117,760 |
| 13 | 9 | 292,500 | 10,292,260 | 112,215 | 6,353,872 | -3,938,388 | 762,000 | 4,644,000 | -5,648,260 |
| 14 | 9 | 204,500 | 10,496,760 | 47,096 | 6,400,968 | -4,095,791 | 906,000 | 5,550,000 | -4,946,760 |
| 15 | 9 | 175,000 | 10,671,760 | 24,671 | 6,425,639 | -4,246,121 | 978,000 | 6,528,000 | -4,143,760 |
| 16 | 9 | 31,000 | 10,702,760 | 24,671 | 6,450,310 | -4,252,450 | 834,000 | 7,362,000 | -3,340,760 |
| 17 | 9 | 31,000 | 10,733,760 | 24,671 | 6,474,981 | -4,258,779 | 834,000 | 8,196,000 | -2,537,760 |
| 18 | 9 | 31,000 | 10,764,760 | 24,671 | 6,499,652 | -4,265,108 | 534,000 | 8,730,000 | -2,034,760 |
| 19 | 9 | 31,000 | 10,795,760 | 24,671 | 6,524,323 | -4,271,437 | 534,000 | 9,264,000 | -1,531,760 |
| 20 | 9 | 31,000 | 10,826,760 | 24,671 | 6,548,994 | -4,277,766 | 534,000 | 9,798,000 | -1,028,760 |
| 21 | 9 | 0 | 10,826,760 | 0 | 6,548,994 | -4,277,766 | 558,000 | 10,356,000 | -470,760 |
| 22 | 8 | -3,151,112 | 7,675,648 | 0 | 6,548,994 | -1,126,654 | 504,000 | 10,860,000 | 3,184,352 |
| 23 | 7 | -1,062,903 | 6,612,745 | 0 | 6,548,994 | -63,751 | 360,000 | 11,220,000 | 4,607,255 |
| 24 | 7 | 0 | 6,612,745 | 0 | 6,548,994 | -63,751 | 360,000 | 11,580,000 | 4,967,255 |
| 25 | 6 | -2,185,416 | 4,427,329 | 0 | 6,548,994 | 2,121,664 | 288,000 | 11,868,000 | 7,440,671 |
| 26 | 6 | 0 | 4,427,329 | 0 | 6,548,994 | 2,121,664 | 288,000 | 12,156,000 | 7,728,671 |
| 27 | 6 | 0 | 4,427,329 | 0 | 6,548,994 | 2,121,664 | 288,000 | 12,444,000 | 8,016,671 |
| 28 | 6 | 0 | 4,427,329 | 0 | 6,548,994 | 2,121,664 | 288,000 | 12,732,000 | 8,304,671 |
| 29 | 6 | 0 | 4,427,329 | 0 | 6,548,994 | 2,121,664 | 144,000 | 12,876,000 | 8,448,671 |
| 30 | 5 | -986,216 | 3,441,113 | 0 | 6,548,994 | 3,107,881 | 144,000 | 13,020,000 | 9,578,887 |
| 31 | 4 | -377,293 | 3,063,820 | 0 | 6,548,994 | 3,485,174 | 0 | 13,020,000 | 9,956,180 |
| 32 | 3 | -899,971 | 2,163,849 | 0 | 6,548,994 | 4,385,145 | 0 | 13,020,000 | 10,856,151 |
| 33 | 2 | -1,148,060 | 1,015,789 | 0 | 6,548,994 | 5,533,205 | 0 | 13,020,000 | 12,004,211 |
| 34 | 2 | 0 | 1,015,789 | 0 | 6,548,994 | 5,533,205 | 0 | 13,020,000 | 12,004,211 |
| 35 | 2 | 0 | 1,015,789 | 0 | 6,548,994 | 5,533,205 | 0 | 13,020,000 | 12,004,211 |

The Pension Trust is assumed to grow at a tax-sheltered rate of 7.00%.
All After Tax Outlays and Proceeds are Compounded at 0.00% (0.00% Before Tax).
The Company's marginal tax rate is 40.00%.

## Composite Summary Of Plan Comparisons

| (1) End of Year | Num. EE's Left | Insured Plan | | Qualified Plan | | | Pay As You Go | | |
|---|---|---|---|---|---|---|---|---|---|
| | | (2) Total Net Annual Outlay | (3) Cum. Net Cost Compounded At 0.00% | (4) After-Tax Qualified Plan Deposit | (5) Cum. Net Deposit At 0.00% | (6) Our Plan Cumulative Advantage | (7) Net Annual Costs Of Benefits | (8) Cumulative Benefits Cash Flow At 0.00% | (9) Our Plan Cumulative Advantage |
| | | | | | | (5-3) | | | (8-3) |
| 36 | 2 | 0 | 1,015,789 | 0 | 6,548,994 | 5,533,205 | 0 | 13,020,000 | 12,004,211 |
| 37 | 2 | 0 | 1,015,789 | 0 | 6,548,994 | 5,533,205 | 0 | 13,020,000 | 12,004,211 |
| 38 | 1 | -643,011 | 372,777 | 0 | 6,548,994 | 6,176,216 | 0 | 13,020,000 | 12,647,223 |
| 39 | 1 | 0 | 372,777 | 0 | 6,548,994 | 6,176,216 | 0 | 13,020,000 | 12,647,223 |
| 40 | | -873,194 | -500,417 | 0 | 6,548,994 | 7,049,410 | 0 | 13,020,000 | 13,520,417 |
| | | -500,417 | | 6,548,994 | | | 13,020,000 | | |

The Pension Trust is assumed to grow at a tax-sheltered rate of 7.00%.
All After Tax Outlays and Proceeds are Compounded at 0.00% (0.00% Before Tax).
The Company's marginal tax rate is 40.00%.

## Company Balance Sheet

**Plan Expenses:**

| | | |
|---|---|---|
| Policy Premiums | $9,892,199 | |
| Policy Loan Interest | $11,035,943 | |
| Benefit Payments | $21,700,000 | |
| Total Plan Expenses: | | $42,628,142 |

**Plan Savings/Credits:**

| | | |
|---|---|---|
| Policy Value Loans | $21,535,943 | |
| Net Death Benefits | $12,912,616 | |
| Benefit Payment Tax Savings | $8,680,000 | |
| Total Plan Savings/Credits: | | $43,128,559 |

**After-Tax Cost of Plan:**      $-500,417

**Cost of Money at Net 0.00%**      $0

**Interest Adjusted Cost Of Plan:**      $-500,417

Please refer to supporting schedules for source of values.



**Penn Mutual**

*A better way of life*

**Individual Line Listing Values**

**For Each Participant**

*of*

**Hickory Springs Manufacturing Corp.**

*Presented by*

**Robert V. Donovan**


**Penn Mutual**
*A better way of life*

## Supplemental Executive Retirement Plan For Cost Recovery SERP

### U N D E R W R I T E R ' S   W O R K S H E E T

Prepared For 10 Participants

Prepared By:  Robert V. Donovan , CLU, ChFC, CFP

| EE No. | Employee Name | Ins. Age | Sex | Risk | Policy | DB Opt | Initial Face Amount | Initial Annual Outlay | Initial Target Premium | Table Rate | Init Flat Extra /1000 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Bush, Jimmy | 57 | M | NS | AB-II-IUL | BA | 1,408,316 | 98,000.00 | 42,222.00 | None | $0.00 |
| 2 | Pierce, Tom | 75 | M | NS | AB-II-IUL | B | 765,672 | 94,999.91 | 62,020.00 | None | $0.00 |
| 3 | Mann, Buster | 62 | M | Prf+ | AB-II-IUL | BA | 1,075,208 | 74,400.00 | 36,779.00 | None | $0.00 |
| 4 | Lunsford, Lee | 55 | M | Prf+ | AB-II-IUL | BA | 1,151,147 | 75,000.00 | 26,591.00 | None | $0.00 |
| 5 | Reid, Valerie | 53 | F | Prf | AB-II-IUL | BA | 654,099 | 29,500.00 | 11,507.00 | None | $0.00 |
| 6 | Welch, Dwayne | 47 | M | Prf+ | AB-II-IUL | BA | 643,516 | 31,000.00 | 10,005.00 | None | $0.00 |
| 7 | Packer, Jim | 56 | M | Prf | AB-II-IUL | BA | 507,928 | 34,200.00 | 13,630.00 | None | $0.00 |
| 8 | Trimble, Blake | 64 | M | Prf+ | AB-II-IUL | BA | 1,027,101 | 52,000.00 | 39,210.00 | None | $0.00 |
| 9 | Underdown, David | 54 | M | Prf | AB-II-IUL | BA | 1,396,708 | 88,000.00 | 33,697.00 | None | $0.00 |
| 10 | Colburn, Dave | 65 | M | NS | AB-II-IUL | A | 5,000,000 | 450,000.00 | 230,000.00 | None | $0.00 |
| | | | | | | | 13,629,695 | 1,027,099.91 | 505,661.00 | | |

Explanation of Risk Codes:     'STD' = Issue Age < 20   'SM'= Standard Tobacco  'NS' = Standard Non-Tobacco
'PT' = Preferred Tobacco 'Prf' = Preferred Non-Tobacco  'Prf+' = Preferred Plus Non-Tobacco   '/R' = Rated

The individual's age shown is current as of the Plan Effective Date of 05/31/2012.
Prepared by: Robert V. Donovan , CLU, ChFC, CFP          Capital Concepts, LLC
Business: 828-322-8210 Ext: 412                          Version: 11.1.0.0

Case 5:18-cv-00104-MOC-DSC   Document 1-1   Filed 07/01/18   Page 82 of 87


**Penn Mutual**
*A better way of life*

## Supplemental Executive Retirement Plan For Cost Recovery SERP

### SUMMARY OF PRE- AND POST-RETIREMENT BENEFITS

Prepared For 10 Participants

Prepared By: Robert V. Donovan , CLU, ChFC, CFP

| EE No. | Employee Name | Ins. Age | Ret Age | Sex | Initial Comp. | Survivor Benefits | | Initial Annual Retirement Benefit | Total Retirement Benefits |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | Initial Pre-Ret Benefit | Final Pre-Ret Benefit | | |
| 1 | Bush, Jimmy | 57 | 67 | M | 200,000 | 0 | 0 | 200,000 | 2,000,000 |
| 2 | Pierce, Tom | 75 | 76 | M | 300,000 | 0 | 0 | 90,000 | 900,000 |
| 3 | Mann, Buster | 62 | 67 | M | 250,000 | 0 | 0 | 240,000 | 2,400,000 |
| 4 | Lunsford, Lee | 55 | 67 | M | 300,000 | 0 | 0 | 240,000 | 2,400,000 |
| 5 | Reid, Valerie | 53 | 67 | F | 150,000 | 0 | 0 | 120,000 | 1,200,000 |
| 6 | Welch, Dwayne | 47 | 67 | M | 300,000 | 0 | 0 | 240,000 | 2,400,000 |
| 7 | Packer, Jim | 56 | 67 | M | 150,000 | 0 | 0 | 90,000 | 900,000 |
| 8 | Trimble, Blake | 64 | 65 | M | 200,000 | 0 | 0 | 90,000 | 900,000 |
| 9 | Underdown, David | 54 | 67 | M | 200,000 | 0 | 0 | 240,000 | 3,600,000 |
| 10 | Colburn, Dave | 65 | 72 | M | 600,000 | 0 | 0 | 500,000 | 5,000,000 |
| | | | | | 2,650,000 | 0 | 0 | 2,050,000 | 21,700,000 |

The individual's age shown is current as of the Plan Effective Date of 05/31/2012.

Prepared by: Robert V. Donovan , CLU, ChFC, CFP
Business: 828-322-8210 Ext: 412

Capital Concepts, LLC
Version: 11.1.0.0

Page 3 of 6
Prepared on: 05/31/2012

Case 5:18-cv-00104-MOC-DSC   Document 1-1   Filed 07/01/18   Page 83 of 87



Penn Mutual
*A better way of life*

## Supplemental Executive Retirement Plan For Cost Recovery SERP

### S U M M A R Y   O F   R E T I R E M E N T   B E N E F I T S

Prepared For 10 Participants

Prepared By: Robert V. Donovan , CLU, ChFC, CFP

| EE No. | Employee Name | Sex | Risk | Ins Age | Ret Age | Initial Comp. | Compensation At Retirement | Final Average Comp. | Initial Annual Retirement Benefit | Total Retirement Benefits | Retirement Benefit As % of Final Avg Comp. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Bush, Jimmy | M | NS | 57 | 67 | 200,000 | 260,955 | 260,955 | 200,000 | 2,000,000 | 76.64 |
| 2 | Pierce, Tom | M | NS | 75 | 76 | 300,000 | 300,000 | 300,000 | 90,000 | 900,000 | 30.00 |
| 3 | Mann, Buster | M | Prf+ | 62 | 67 | 250,000 | 281,377 | 281,377 | 240,000 | 2,400,000 | 85.29 |
| 4 | Lunsford, Lee | M | Prf+ | 55 | 67 | 300,000 | 415,270 | 415,270 | 240,000 | 2,400,000 | 57.79 |
| 5 | Reid, Valerie | F | Prf | 53 | 67 | 150,000 | 220,280 | 220,280 | 120,000 | 1,200,000 | 54.48 |
| 6 | Welch, Dwayne | M | Prf+ | 47 | 67 | 300,000 | 526,052 | 526,052 | 240,000 | 2,400,000 | 45.62 |
| 7 | Packer, Jim | M | Prf | 56 | 67 | 150,000 | 201,587 | 201,587 | 90,000 | 900,000 | 44.65 |
| 8 | Trimble, Blake | M | Prf+ | 64 | 65 | 200,000 | 200,000 | 200,000 | 90,000 | 900,000 | 45.00 |
| 9 | Underdown, David | M | Prf | 54 | 67 | 200,000 | 285,152 | 285,152 | 240,000 | 3,600,000 | 84.17 |
| 10 | Colburn, Dave | M | NS | 65 | 72 | 600,000 | 716,431 | 716,431 | 500,000 | 5,000,000 | 69.79 |
| | | | | | | 2,650,000 | 3,407,105 | 3,407,105 | 2,050,000 | 21,700,000 | |

Explanation of Risk Codes:        'STD' = Issue Age < 20  'SM'= Standard Tobacco  'NS' = Standard Non-Tobacco
                                  'PT' = Preferred Tobacco 'Prf' = Preferred Non-Tobacco  'Prf+' = Preferred Plus Non-Tobacco  '/R' = Rated

The individual's age shown is current as of the Plan Effective Date of 05/31/2012.

Prepared by: Robert V. Donovan , CLU, ChFC, CFP          Capital Concepts, LLC          Page 4 of 6
Business: 828-322-8210 Ext: 412                          Version: 11.1.0.0             Prepared on: 05/31/2012


**Penn Mutual**
*A better way of life*

## Supplemental Executive Retirement Plan For Cost Recovery SERP

### SUMMARY OF INSURANCE FUNDING

Prepared For 10 Participants
Prepared By: Robert V. Donovan , CLU, ChFC, CFP

| EE No. | Employee Name | Sex | Ins. Age | Mor Age | Initial Face Amount | Initial Annual Outlay | Charge To Earnings | | | | Internal Rate Of Return On Insurance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Cumulative Net Insurance Cash Flow | Cum Net Cost Of Benefits | Net Death Benefit At Mort. | Cum Net Charge To Earnings | |
| 1 | Bush, Jimmy | M | 57 | 86 | 1,408,316 | 98,000 | -1,206,216 | 1,200,000 | 986,216 | -6,216 | 5.38 |
| 2 | Pierce, Tom | M | 75 | 86 | 765,672 | 95,000 | -540,440 | 540,000 | 1,585,440 | -440 | 6.81 |
| 3 | Mann, Buster | M | 62 | 86 | 1,075,208 | 74,400 | -1,441,416 | 1,440,000 | 2,185,416 | -1,416 | 5.61 |
| 4 | Lunsford, Lee | M | 55 | 86 | 1,151,147 | 75,000 | -1,439,971 | 1,440,000 | 899,971 | 29 | 6.43 |
| 5 | Reid, Valerie | F | 53 | 90 | 654,099 | 29,500 | -950,011 | 720,000 | 643,011 | -230,011 | 6.67 |
| 6 | Welch, Dwayne | M | 47 | 86 | 643,516 | 31,000 | -1,693,194 | 1,440,000 | 873,194 | -253,194 | 6.85 |
| 7 | Packer, Jim | M | 56 | 86 | 507,928 | 34,200 | -541,093 | 540,000 | 377,293 | -1,093 | 6.05 |
| 8 | Trimble, Blake | M | 64 | 86 | 1,027,101 | 52,000 | -542,903 | 540,000 | 1,062,903 | -2,903 | 4.13 |
| 9 | Underdown, David | M | 54 | 86 | 1,396,708 | 88,000 | -2,164,060 | 2,160,000 | 1,148,060 | -4,060 | 6.36 |
| 10 | Colburn, Dave | M | 65 | 86 | 5,000,000 | 450,000 | -3,001,112 | 3,000,000 | 3,151,112 | -1,112 | 5.39 |
| | | | | | 13,629,695 | 1,027,100 | -13,520,417 | 13,020,000 | 12,912,616 | -500,417 | |

The individual's age shown is current as of the Plan Effective Date of 05/31/2012.

The assumed death age of each individual is based on Death at Funded Mortality.

Prepared by: Robert V. Donovan , CLU, ChFC, CFP
Business: 828-322-8210 Ext: 412

Capital Concepts, LLC
Version: 11.1.0.0

Page 5 of 6
Prepared on: 05/31/2012

Case 5:18-cv-00104-MOC-DSC   Document 1-1   Filed 07/01/18   Page 85 of 87



Penn Mutual
*A better way of life*

## Supplemental Executive Retirement Plan For Cost Recovery SERP

### OUR PLAN VERSUS A QUALIFIED PLAN

Prepared For 10 Participants

Prepared By: Robert V. Donovan , CLU, ChFC, CFP

| EE No. | Employee Name | Ins. Age | Initial Comp. | Insured Plan | | | Qualified Plan | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Initial Pre-Ret Benefit | Total Retirement Benefits | Cum Net Charge To Earnings | Yrs To Retire | Qualified Plan After-Tax Deposit | Qualified Plan Charge To Earnings |
| 1 | Bush, Jimmy | 57 | 200,000 | 0 | 2,000,000 | -6,216 | 10 | 61,002 | 610,019 |
| 2 | Pierce, Tom | 75 | 300,000 | 0 | 900,000 | -440 | 1 | 379,273 | 379,273 |
| 3 | Mann, Buster | 62 | 250,000 | 0 | 2,400,000 | -1,416 | 5 | 175,872 | 879,362 |
| 4 | Lunsford, Lee | 55 | 300,000 | 0 | 2,400,000 | 29 | 12 | 56,539 | 678,468 |
| 5 | Reid, Valerie | 53 | 150,000 | 0 | 1,200,000 | -230,011 | 14 | 22,425 | 313,952 |
| 6 | Welch, Dwayne | 47 | 300,000 | 0 | 2,400,000 | -253,194 | 20 | 24,671 | 493,418 |
| 7 | Packer, Jim | 56 | 150,000 | 0 | 900,000 | -1,093 | 11 | 24,030 | 264,325 |
| 8 | Trimble, Blake | 64 | 200,000 | 0 | 900,000 | -2,903 | 1 | 379,273 | 379,273 |
| 9 | Underdown, David | 54 | 200,000 | 0 | 3,600,000 | -4,060 | 13 | 65,119 | 846,548 |
| 10 | Colburn, Dave | 65 | 600,000 | 0 | 5,000,000 | -1,112 | 7 | 243,479 | 1,704,355 |
| | | | 2,650,000 | 0 | 21,700,000 | -500,417 | | 1,431,684 | 6,548,994 |

The individual's age shown is current as of the Plan Effective Date of 05/31/2012.

The Pension Trust is assumed to grow at a tax-sheltered rate of 7.00%.

Prepared by: Robert V. Donovan , CLU, ChFC, CFP
Business: 828-322-8210 Ext: 412

Capital Concepts, LLC
Version: 11.1.0.0

Page 6 of 6
Prepared on: 05/31/2012

Case 5:18-cv-00104-MOC-DSC   Document 1-1   Filed 07/01/18   Page 86 of 87

**CERTIFIED MAIL**

PATRICK, HARPER & DIXON L.L.P.
ATTORNEYS AT LAW
P. O. BOX 218
HICKORY, N. C. 28603

7017 3040 0001 1797 6555

Hasler
05/31/2018
US POSTAGE $13.50

PRIORITY MAIL

ZIP 28601
011D11644825

# FIRST CLASS MAIL

**Arch Insurance Company**
**300 Plaza Three, 3rd Floor**
**Jersey City, NJ 07311**